Reginald Jerome LOVE, Petitioner–
Appellant,

v.

Aaron JOHNSON, Secretary of Correction;
Lacy Thornburg, Attorney General, Re-
spondents–Appellees.

No. 92–7080.

United States Court of Appeals,
Fourth Circuit.

Argued March 11, 1994.

Decided June 22, 1995.

**ARGUED:** Paul MacAllister Green, North Carolina Prisoner Legal Services, Inc., Raleigh, NC, for appellant. Clarence Joe Del-Forge, III, Asst. Atty. Gen., North Carolina Dept. of Justice, Raleigh, NC, for appellees. **ON BRIEF:** Linda B. Weisel, North Carolina Prisoner Legal Services, Inc., Raleigh, NC, for appellant. Michael F. Easley, Atty. Gen., N.C. Dept. of Justice, Raleigh, NC, for appellees.

Before MURNAGHAN and HAMILTON, Circuit Judges, and PHILLIPS, Senior Circuit Judge.

Vacated and remanded by published opinion. Senior Judge PHILLIPS wrote the opinion, in which Judge MURNAGHAN and Judge HAMILTON joined.

## OPINION

PHILLIPS, Senior Circuit Judge:

Reginald Jerome Love appeals the dismissal of a petition for writ of habeas corpus challenging his state conviction on charges of first degree rape, first degree sex offense, and taking indecent liberties with a minor. Love claims that he was denied access to

evidence in violation of rights guaranteed by the Sixth and Fourteenth Amendments. Because Love made a plausible showing that sufficiently identified state agency records might contain evidence that was material and favorable to his defense, the state court's refusal to inspect the identified records *in camera* and to seal any not disclosed for appellate review violated Love's constitutional right to such a procedure. Accordingly, we vacate the United States District Court's dismissal of Love's petition and remand to that court for further proceedings.

I

In March 1989, the alleged victim, then a nine-year-old girl ("the minor"), wrote a note to her mother indicating in explicit detail that she had been sexually abused by the petitioner, Reginald Jerome Love who, at the time, was her mother's live-in boyfriend. The couple, along with the minor, two other of the mother's children, and the minor's grandmother shared an apartment in Raleigh, North Carolina.

In the evening of the day her mother read her note, the minor, her mother, and Love discussed it. According to the minor, Love denied subjecting her to such abuse, but suggested that she be taken to see a doctor, and her mother, after first objecting, agreed. J.A. 239. Several days later, the minor was taken by her mother to Wake Medical Center where she was interviewed by Kimberly Crews, a counselor, and then examined by Dr. Denise Everette. A contemporaneous report of the interview prepared by Ms. Crews indicated that the minor first denied that Love had abused her but then described in detail an episode of sexual abuse by Love on March 18, 1989, that included sexual intercourse. Dr. Everette's contemporaneous report of her examination indicated discovery of healed hymenal lacerations. It also contained a marginal notation of an earlier medical examination of the minor on October 24, 1988 related to a menstrual period lasting three days and a complaint of pain upon urination for a week. Following Dr. Everette's examination, the minor repeated her accusation to a school counselor, to a Depart-

ment of Social Services (DSS) staff member, and to a Raleigh police detective.

In May 1989, Love was indicted for one count of first degree rape, one count of first degree sexual offense and one count of taking indecent liberties with a minor. All of the offenses charged were alleged to have occurred on March 18, 1989, the date of the minor's note to her mother.

As the trial approached, Love's attorney focused his efforts on obtaining evidence to support the theory that Love was an innocent man falsely accused by a young girl who was emotionally disturbed for other reasons than his conduct. To that end, he "considered it of central importance to expose every weakness in [the minor]'s credibility, and to provide the jury with a convincing explanation for her false accusation." J.A. 77.

In pre-trial discovery, the state district attorney's office voluntarily produced the report of Dr. Everette's physical examination, the report of counselor Crews' interview, and the police report of the March 18th incident.

Believing that other possibly exculpatory material existed, Love's counsel filed in Wake County Superior Court a "Motion for Discovery [*Brady v. Maryland*]." J.A. 27. Among other things, the motion requested that "the State provide the Defendant with . . . the alleged victim's entire medical record maintained at Wake Medical Center . . . the alleged victim's entire file maintained by the Wake County Mental Health Department . . . [and] the alleged victim's entire file maintained by the Wake County Department of Social Services." J.A. 29. On the same day, Love's counsel also filed a "Motion for Early Disclosure of Statements of the State's Prosecuting Witness[es]." J.A. 31–33.

A week later, on May 17, 1989, Superior Court Judge Donald W. Stephens presided over a hearing on these motions. At the hearing, Love's counsel, seeking to demonstrate Love's entitlement to the requested records, made several representations to the court. First, he asserted that before the date of the alleged incident, the minor had been receiving psychiatric care and counseling at the Wake Mental Health Center, presumably because of several incidents of bi-

zarre behavior, including attempts to set fires in her residence. He also asserted that the minor was presently receiving counseling at the DSS, which had taken her from her mother's custody because of the mother's original refusal to believe the child's assertions, and that the defense was entitled to all exculpatory statements made to DSS officials by the mother. J.A. 108–09. Although the state prosecutor's response characterized defense counsel's assertions as being only "allegations," she did not dispute their factual accuracy and indeed volunteered that the minor was "on Ritalin" because of hyperactivity and had been the subject of a recent civil proceeding which had involved a medical witness. J.A. 110–11. The prosecutor's position was essentially that her office, hence the state, had voluntarily provided defense counsel with all exculpatory statements in its possession; that her office had in its possession no reports respecting the minor's psychiatric care; and that the state therefore had provided all that it was required by law to provide. J.A. 110–12. Defense counsel then reasserted his belief that some reports concerning the minor's "treatment for mental health problems" necessarily existed and were "readily available to the state or the [DSS]." J.A. 112.

Judge Stephens then ruled from the bench on the defense motion for production of *Brady* materials. He first noted that "the [state] District Attorney has the obligation to provide what the District Attorney has, and if the District Attorney has no such reports then I can't enter an order compelling disclosure which they do not have." J.A. 112. The judge then suggested to Love's counsel an alternative means of obtaining the information: "subpoena these people you think are involved to trial, along with a subpoena duces tecum to bring their records. If they object, I'll have a hearing and see whether or not I will require them to disclose that to you." J.A. 112.

He then expanded on this ruling:

If the State has not obtained or provided this information to you prior to trial, you subpoena these people, they bring in records. I will require that they at least disclose those to the Court. After exami-

nation, [if] I think you're entitled to them, and I'll provide them to you. If it appears then that you need additional time, I'll allow your motion to continue the case. If it appears then that you need additional expert assistance, I'll consider your motion for additional expert assistance.

. . . . .

I don't do any thing until I see what we're dealing with. If the State wants to avoid some of those hurdles and the possibility of continuance, maybe they'll get the reports and see what's there; if not, we'll deal with it at the time it's called for trial.

. . . . .

There may not be anything there. There may not even be any reports. We'll just have to wait and see, okay?

J.A. 113.

On June 7 and 12, 1989, Love's counsel then issued six subpoenas to, respectively:

(1) Faye Suggs, Medical Records Custodian of Wake Medical Center, to appear and testify and to produce the "complete medical file of [the minor] . . ., including all reports, tests, lab results and examinations."

(2) Counselor Kim Crews at Wake Medical Center, to appear and testify and to produce "all tapes, notes and records regarding your interview(s) with [the minor]."

(3) Pearl Alston, Medical Records Custodian of the Wake County Mental Health Center, to appear to testify and to produce "the complete medical file of [the minor]."

(4) Dr. Edward Morris of the Wake County Mental Health Center, to appear to testify and to produce "all records, files and reports concerning [the minor]."

(5) Cheryl Passarrelli of the Wake County DSS, to appear to testify and to produce "all [DSS] Records relating to [the minor] . . . including but not limited to: Any written reports made by anyone connected with this case; all reports of conversations between . . . [Love], child's natural parents, foster

parents, the child and any member of the [DSS]; reports made to any law enforcement agency or medical provider."

(6) Betty Cannon, Custodian of School Records for Wake County Public Schools, to appear and testify and to produce "the entire student file of [the minor]."

J.A. 34–44.

The return date on all the subpoenas was the scheduled trial date, June 19, 1989. In the interval, no person or agency named in the subpoenas objected to compliance, so that no pre-trial hearing on any of the subpoenas was required.

When the case came on for trial as scheduled, another superior court judge, Judge I. Beverly Lake, Jr., had been assigned to conduct the trial. It is obvious from the state court record that he did not have the benefit of a transcript of the proceedings before Judge Stephens or direct knowledge of those proceedings from any other source, and that he knew from the file only that a *Brady* motion had been "ruled upon" by Judge Stephens. J.A. 163. In consequence, when the matter was raised along with other motions at the call of the case, Judge Lake could only reconstruct what had earlier occurred from the sketchy and sometimes conflicting accounts of counsel. *See* J.A. 158–84. Confusion inevitably resulted that has made precise reconstruction and evaluation of what then transpired before Judge Lake difficult for all the courts reviewing those proceedings. Certain critical aspects, sufficient for decision in this case, can, however, be summarized.

The matter of the *Brady* motion and the follow-up subpoenas was introduced by defense counsel. He advised the court that he had issued subpoenas for production of the minor's "entire medical file from Wake Medical Center [and] her records from the Wake County Public School and also the records from the Wake County Mental Health Department;" that he believed the prosecutor had the subpoenaed materials but did not intend to turn them over to the defense; and that the defense was entitled to review them in advance of trial. J.A. 158–59. He indicated an understanding that the prosecutor would move to quash the subpoenas and asked that the court either direct the prosecutor to turn over the subpoenaed material or allow him to be heard on the state's motion to quash. J.A. 159. In response, the prosecutor confirmed an "intent" to move to quash "*the* subpoena." J.A. 159 (emphasis added). She then identified "the" subpoena to which she referred as only that one issued to the medical records custodian of the Wake County Mental Health Center, and indicated that she, the prosecutor, had in her possession certain records mailed in by that custodian in response to the subpoena, but that she had not yet reviewed them. She then referred to state law which, she asserted, might make some of those subpoenaed records subject to a psychologist-patient privilege. J.A. 159–61. Significantly, however, she then indicated that the privilege was a qualified one which might, in appropriate cases, be overridden by court order. J.A. 161. And she suggested, without reference to Judge Stephens' specific promise of an *in camera* inspection of any records produced by subpoenas duces tecum, that this was the "appropriate route" for the court to take, and that if such an inspection revealed "exculpatory information … it should be turned over to [the defendant]." J.A. 161–62. Defense counsel then pressed the need for access to these Mental Health Center records in advance of trial in order to see if a court-appointed psychiatrist might be needed to help prepare Love's defense. J.A. 164–66. In response, the prosecutor asserted a recollection—incorrect in fact and disputed by defense counsel—that Judge Stephens had indicated that any questions of entitlement of the defense to expert assistance should be dealt with "during the course of trial" when the state called as witness "the psychologist who had some contact with the child." J.A. 167.

At this point, with no formal motion respecting the subpoenas for Wake County Mental Health Center records or any other having been made, discussion shifted confusedly to Wake Medical Center records. Laboriously, the court was made aware, in colloquy with counsel, of the earlier voluntary

disclosure to defense counsel of the reports of Counselor Crews and Dr. Everette concerning their interviews of the minor in March of 1989. Defense counsel then pointed out that he had subpoenaed all the Medical Center records, and explained his need of them, specifically pointing to the marginal notation on Dr. Everette's March 1989 notes of her medical examination that suggested an earlier medical admission that might have involved injury to the minor's genital area. J.A. 171–72. The prosecutor then denied any knowledge as to whether that subpoena had been served, J.A. 177; denied having in her possession any records subpoenaed from any agency other than those of the Wake Medical Center that were earlier voluntarily disclosed to defense counsel, J.A. 183–84; and repeated her contention that any questions concerning medical records involving the minor should be dealt with at trial in connection with the examination of the state's witnesses rather than in advance of trial. J.A. 175–76. At this point, it is plain from the state court record that the trial judge was badly confused as to the number of subpoenas that had been issued; the identity of the agencies whose records had been subpoenaed; which, if any, of the subpoenas had been served; which, if any, of those served had been honored by the production of subpoenaed materials on the designated return date; and who, if anyone, had possession of any records produced other than those of the Wake County Mental Health Department which the prosecutor indicated were then in her possession. J.A. 163, 169, 174, 177–79. In this state of confusion, defense counsel, who understandably had assumed throughout that, because there had been no objections or motions to quash any of his subpoenas, the materials were then available to the court, sought repeatedly to bring this to the court's attention and to emphasize his need for access to all the materials in advance of trial. J.A. 158, 159, 165, 168–69, 177. His efforts were, however, unsuccessful. Whether, in fact, any records other than those of the Wake Mental Health Center were actually produced in response to the subpoenas is not revealed by the record. It is plain, however, that the trial judge never sought to determine whether any other materials had been produced

and were available for his inspection and that he did not inspect any of those that were known to have been produced. It is further plain that the only subpoena which the judge inspected was that issued to the Wake Mental Health Center that had produced the records that remained throughout in the prosecutor's possession.

This general state of confusion and uncertainty led finally to an equally confused series of specific rulings whose result was the actual (or assumed) quashing of all the subpoenas.

Focusing on the subpoena issued to the Wake Mental Health Department, the only one ever inspected, the judge inquired of the prosecutor whether her motion was to quash it. When she answered in the affirmative, the judge ruled from the bench that "[a]fter reviewing the subpoena I believe it's overbroad in asking for the complete medical file in matters relevant to trial. . . . So, the court is going to allow the Motion to Quash the subpoena ordering the complete medical file of the victim." J.A. 178–79. When defense counsel, picking up on the reference to "medical file," immediately inquired whether the ruling pertained to the subpoenas to "Wake Medical Center or Wake Mental Health Center or Department of Social Services or . . . Kim Crews," the court as immediately revealed its confusion about the subject of the specific subpoena on which it had ruled. J.A. 179. The prosecutor, sensing the court's confusion and her opportunity, quickly interceded, pointing out that it was the subpoena to "Mental Health," but then sought to amend the quashal motion to "read the quashing of all of the medical information as it relates to instances not involving the specific case that is presently before the Court." J.A. 179.

Resisting the obvious drift of matters, defense counsel again pointed out that more subpoenas than that to the Mental Health Center had been issued, and again sought to explain his need for access to the materials identified in them in order to prepare for trial. J.A. 180, 182. He succeeded only in getting the court's attention to his specific need for access to any medical records that might relate to the earlier medical examina-

tion of the minor in October of 1988 that was suggested in Dr. Everette's notes of her March 1989 examination. J.A. 179–181. When the prosecutor then renewed her motion to quash "all of" the subpoenas on the grounds that "they are not relevant, speculative," the judge then again ruled from the bench: "I'm going to allow the Motion to Quash the subpoena [sic] with the exception of the medical records of the Wake Medical Center . . . as they relate to the examination of the victim in October of 1988." J.A. 182–83. Later, concluding the hearing on this matter, the judge stated: "With that exception then, the Motion to Quash the four [sic] separate . . . subpoenas duces tecum are allowed." J.A. 184.

Following this hearing, the prosecutor obtained the minor's Wake Medical Center records for the month of October, 1988, from Dr. Everette and delivered copies to defense counsel and to the court immediately before trial commenced. J.A. 189. Instead of a report of menstrual bleeding and pain upon urination on October 24, 1988, as Dr. Everette's notation had suggested, the records revealed a hospital emergency room admission on October 10, 1988, in which the minor had complained of injuries to her knee and to her genital area from a fall during play at school. J.A. 189–90. The report did not indicate the results of any genital examination that may have been performed. J.A. 190.

At the ensuing trial, the minor, her mother, her grandmother, an investigating police officer, Counselor Crews, Dr. Everette, and Dr. Robert Kratz testified as state's witnesses. The minor testified in detail that Love had sexually abused her as charged in the indictment. The investigating police officer and Counselor Crews testified that the minor had stated to each of them in their respective investigative interviews that Love had sexually abused her on the occasion charged, though Crews conceded that the minor had first denied that any abuse occurred. Dr. Everette gave it as her medical opinion, based on her interview and physical examination of the minor and the medical history of which she was aware that she "exhibit[ed] certain characteristics of a child

who had been sexually abused" and that the healed hymenal lacerations disclosed by her physical examination were consistent with the occurrence of sexual abuse as described by the minor. J.A. 419–20. Dr. Robert Kratz, who examined the minor upon her emergency hospital admission on October 10, 1988, testified as to that event. He confirmed that the minor had then reported to intake personnel that she had received a playground injury to both her knee and to her genital area, but stated that because she had not mentioned any genital injury to him, he made no examination of that area.

Love's defense consisted of his own testimonial denial of the charged incident, and cross-examination of the state's witnesses designed to impeach the minor's general and specific credibility and to emphasize the physical implausibility of her account of the charged incidents having occurred undetected just down the hall from her grandmother's open-door room. Defense counsel was able to elicit from the minor concessions of her animosity, "hate," toward Love that predated the charged incident; of her advanced sexual awareness; and of her treatment by prescription drug for hyperactivity. This supplemented earlier testimony elicited by the prosecutor on direct examination in which the minor had conceded attention-seeking episodes of bizarre behavior on her part—shaving her eyebrows, setting fires in her residence—that were followed by psychiatric counseling. No records concerning her conceded counseling at Wake Mental Health Center or her custody by the Department of Social Services (the subject of two of the quashed subpoenas) were introduced. Testifying in his own behalf, Love denied any sexual encounter with the minor at any time. He claimed her account was simply false and attributed it to her animosity and resentment of his relationship with her mother.

The jury found Love guilty as charged. He was sentenced to two concurrent life terms on the two principal charges and to a five-year term on the third.

On his direct appeal in the state court system, Love's convictions were affirmed by the North Carolina Court of Appeals. *State v. Love,* 100 N.C.App. 226, 395 S.E.2d 429

(1990). The court rejected Love's claim of a federal constitutional violation in the failure of the trial court to conduct an *in camera* inspection of the subpoenaed records. The court thought that because "the trial court's concern was the overbreadth of the subpoena [sic] and, to an extent, the lack of any showing of materiality (with the exception of the October 1988 medical report)," rather than any claim of state evidentiary privilege, *Pennsylvania v. Ritchie*, 480 U.S. 39, 107 S.Ct. 989, 94 L.Ed.2d 40 (1987), which in a comparable sex-abuse case upheld a defendant's right to *in camera* inspection over a claim of state evidentiary privilege, was not controlling. *Id.* 395 S.E.2d at 432. The North Carolina Supreme Court denied discretionary review without opinion. *State v. Love*, 328 N.C. 95, 402 S.E.2d 423 (1991).

Love then sought federal habeas corpus relief under 28 U.S.C. § 2254 in the United States District Court, claiming a constitutional violation in the refusal of the state trial court to conduct an *in camera* inspection of the subpoenaed records to determine their possibly exculpatory nature. He relied principally, as he had on his direct appeal, on *Ritchie* as determinative of the right claimed and of its violation. On cross-motions for summary judgment, and without any evidentiary hearing, the district court rejected the claim of constitutional violation and dismissed the petition.

Addressing *Ritchie's* applicability to the case, the district court rejected its applicability, opining in critical part:

[I]n *Ritchie* the Court struck a due process balance which required the state to give the documents in its possession to the judge for his *in camera* review, notwithstanding the state confidentiality law. In the present case, the parties disagree over whether the subpoenaed documents were in the possession of the state. Assuming that they were, however, the state satisfied its obligations under *Ritchie* by offering to give them to the judge for his *in camera* review. Unlike *Ritchie*, the petitioner in the present case was denied access to the documents not because the state tried to withhold them but because the trial judge

determined that the petitioner's subpoenas were overbroad.

There is nothing in *Ritchie* which suggests that the trial judge was obligated to review the subpoenaed documents *in camera* after determining that the subpoenas were overbroad. Instead, the petitioner's attorney should have drafted additional, narrower subpoenas or made some other more specific request for the documents. J.A. 91–92. On this basis, the court concluded that the state court did not violate any federal constitutional right in declining to inspect the subpoenaed materials *in camera* or to seal them for appellate review, and dismissed the petition.

This appeal followed.

## II

■ Love's claim of constitutional violation is, as it was in the state courts and in the United States District Court, that he was improperly denied access to possibly material evidence favorable to his defense by the state court's quashing of his various subpoenas duces tecum without having conducted any *in camera* inspection of the subpoenaed materials. He locates the source of the right violated in the Due Process Clause of the Fourteenth Amendment and (through incorporation) in the Compulsory Process Clause of the Sixth Amendment.

We agree that he properly invoked such a constitutional right and that it was violated as he claims. Supreme Court precedent locates the right he invoked in both sources, but identifies the Due Process Clause as the appropriate, necessarily broader, source for evaluating the type claim made by Love. *See Pennsylvania v. Ritchie*, 480 U.S. 39, 56, 107 S.Ct. 989, 1000–01, 94 L.Ed.2d 40 (1987).

*Ritchie* applied the Due Process Clause to find a violation in a situation indistinguishable in any material respect from that presented in this case. There, as here, a state-court defendant charged with rape and related sexual offenses of a minor (there his natural daughter) issued a subpoena duces tecum to obtain records of a state agency charged with investigating cases of suspected child abuse as they pertained to the alleged victim.

There, as here, a state trial judge, without inspecting the records produced by the agency, declined, there on grounds of statutory confidentiality, to order their disclosure. The Supreme Court, drawing on the line of cases including *United States v. Bagley,* 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985); *United States v. Valenzuela–Bernal,* 458 U.S. 858, 102 S.Ct. 3440, 73 L.Ed.2d 1193 (1982); *United States v. Agurs,* 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976); and *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), that have defined the constitutional right of criminal defendants to disclosure of exculpatory evidence in the government's possession, found that right violated in the case before it.

■ The basic constitutional right recognized in *Ritchie* is the well-established right of an accused to disclosure of evidence in the prosecuting government's possession that "is both favorable to the accused and material to guilt or punishment." *Ritchie,* 480 U.S. at 57, 107 S.Ct. at 1001. In recognizing the right's applicability to the case before it, the Court pointed out that evidence is "material" in the required sense "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different" and that "[a] 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Id.* (citing *Bagley,* 473 U.S. at 682, 105 S.Ct. at 3383–84 (opinion of Blackmun, J.)). Evidence may be "favorable" in the required sense not only when it tends substantively to negate guilt but also when it tends to impeach the credibility of a key witness for the prosecution. *Giglio v. United States,* 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972); *see Jean v. Rice,* 945 F.2d 82, 87 (4th Cir.1991). When, as in *Ritchie* and in the instant case, an accused cannot possibly know, but may only suspect, that particular information exists which meets these requirements, he is not required, in order to invoke the right, to make a particular showing of the exact information sought and how it is material and favorable. Instead, he need only at that stage "at least make some plausible showing" that it does exist and how it would be "both material and favorable to his defense." *Rit-*

*chie,* 480 U.S. at 58 n. 15, 107 S.Ct. at 1002 n. 15. Upon making such a showing, the accused does not become entitled to direct access to the information to determine for himself its materiality and favorability. *Id.* at 59, 60, 107 S.Ct. at 1002, 1003. Rather, he does become entitled, in order to secure the basic right, to have the information he has sufficiently identified submitted to the trial court for *in camera* inspection and a properly reviewable judicial determination made whether any portions meet the "material" and "favorable" requirements for compulsory disclosure. *Id.* at 60, 107 S.Ct. at 1003.

In *Ritchie,* the accused was held to have made the requisite showing when, at a trial court hearing on his motion to compel compliance with his subpoena for agency records, he simply "argued that he was entitled to the information because the file might contain the names of favorable witnesses, as well as other, unspecified exculpatory evidence." *Id.* at 44, 107 S.Ct. at 994. Given the context of the case and the nature of the charges, this was enough, the Court held, to make "Ritchie ... entitled to know whether the [agency] file contains information that may have changed the outcome of his trial had it been disclosed," *id.* at 61, 107 S.Ct. at 1003, not by personal inspection, but by *in camera* judicial inspection to make a reviewable discretionary determination of his right to disclosure. *Id.* at 58, 60, 107 S.Ct. at 1001–02, 1003.

■ In the instant case, Love's showing far exceeded that held sufficient by the *Ritchie* Court. His showing actually first, and sufficiently, occurred on the hearing before Judge Stephens on Love's pre-trial motion for discovery of *"Brady* material." At that hearing, Love's counsel identified, as had his written motion, three state agencies—the Wake County Medical Center, the Wake County Mental Health Department, and the Wake County Department of Social Services—whose records, he argued, might contain material evidence favorable to Love's defense. And he went considerably beyond the meager showing held sufficient in *Ritchie* to demonstrate how and why they might so

qualify in view of the alleged victim's undisputed involvement with each agency.

■ As our account of the state court proceedings reveals, much concerning the records happened thereafter, but so far as the constitutional issue is concerned, it was largely irrelevant misadventure that culminated in the violation of a right earlier invoked. Love's "showing" before Judge Stephens was sufficient to trigger the right to *in camera* inspection of the records at that point, and needed nothing further. Judge Stephens in fact seems to have recognized this. He promised such an inspection, but chose to require that the records sought be obtained via subpoena duces tecum. His stated reason for doing so—that the state was required to disclose only information in the prosecutor's possession—was almost certainly erroneous as a legal proposition. The *"Brady"* right, as recognized and implemented in *Ritchie*, is not limited to information in the actual possession of the prosecutor and certainly extends to any in the possession of state agencies subject to judicial control. *See Ritchie*, 480 U.S. at 44 n. 4, 107 S.Ct. at 994 n. 4 (pointing out that agency records held subject to *in camera* inspection were not in prosecutor's possession).

Be that as it may, the fact that Judge Stephens chose—perhaps in a wise exercise of prudence—to proceed in this way rather than by directly ordering state officials to produce the records for his inspection could not alter Love's right to inspection already invoked. And the fact that Love then followed the prescribed procedure by issuing subpoenas to the agencies earlier identified in his discovery motion (plus additional ones to the Wake County Public Schools and to Counselor Crews individually) could not affect or waive the right. *See Ritchie*, 480 U.S. at 43–4, 107 S.Ct. at 994 (right invoked in first instance by motion to compel compliance with subpoena to agency rather than by *Brady* discovery-motion).

It is clear—and ironic—that had Judge Stephens remained in the case and followed through on his stated intention, Love's constitutional right to have the records judicially inspected to determine his right to access would have been fully protected. Unfortunately, because of sheer mischance and considerable obfuscation—whether or not deliberate—by the state prosecutor, the right simply fell through the cracks in the pre-trial proceedings before the different judge assigned to try the case. Without recapitulating our account of those proceedings and attempting to locate the exact point at which Judge Stephens' adequately protective plan for proceeding went awry, it suffices to say that the right was flatly violated by the ultimate quashing of all of Love's subpoenas—whatever the reason that prompted the ruling. The consequence was that Love was put to trial without any judicial inspection having been undertaken to determine whether the records he had appropriately identified might contain material evidence favorable to his defense. Just as that constituted constitutional error requiring remedy in *Ritchie, see id.* at 58, 107 S.Ct. at 1001–02, so it did here.

■ The district court seemed to recognize *Ritchie*'s general authority in the matter at issue but thought it distinguishable because in the instant case the state prosecutor had offered to submit for *in camera* inspection such subpoenaed materials as "were in the possession of the state,"[1] and

---

1. As our account of the state court proceedings reveals, it is not at all clear just what materials such an offer of submission actually included. As the record indicates, the state trial judge never determined—or made inquiry as to—how many of the subpoenaed materials had actually been produced and were immediately available for his inspection were he inclined to inspect them. The state prosecutor relentlessly disclaimed any knowledge as to which of the subpoenas other than that served on the Wake Mental Health Center had been obeyed by production of materials, or indeed whether any others had been served. Whether this involved deliberate dissembling or equally surprising ignorance of those important facts is, however, irrelevant to the issue. The upshot is that, whatever the nature of the offer of submission, the state trial judge quashed all the subpoenas without determining or seeking to determine which had been honored, and, indeed without inspecting any but that served on the Wake County Mental Health Center. As the district court observed from its review of the state court proceedings: "[T]here was confusion in the trial court regarding the number of subpoenas which the prosecutor was moving to quash ... [and] the number of subpoe-

this, the court thought, "satisfied its obligations under *Ritchie.*" J.A. 92. On this view, the refusal of the state trial judge then to inspect—because the subpoena[s] were "overbroad"² —was of no constitutional significance.

This cannot be right. The constitutional obligation imposed by *Ritchie* is one imposed upon the state, which means upon the judge as well as all other state actors involved in the process of insuring *in camera* inspection of evidence sufficiently shown, under *Ritchie,* to be subject to that inspection. If inspection is effectively denied by any actor in the chain, including the judge as final actor, the fact that some other actors in the chain may have discharged their portion of the obligation cannot insulate a violation further on. Neither can the obligation of the judge, as final actor in the process, be avoided by drawing on state-law requirements of specificity of subpoenas which may be—and undoubtedly are—considerably more stringent than the merely "plausible showing" which, under *Ritchie* suffices to require *in camera* inspection. *See Ritchie,* 480 U.S. at 58 n. 15, 107 S.Ct. at 1002 n. 15.

### III

■ The state seeks to avoid application of the rule we apply on the now practically inevitable claim that to do so would violate the "new-rule" prohibition of *Teague v. Lane,* 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989), and its progeny. There is no merit to this claim; indeed, it borders on the frivolous. The rule applied is narrowly and only that laid down by the Supreme Court of the United States in *Ritchie,* a case decided well over two years before the state court ruling

that is challenged in Love's petition. Because of the stark similarities between *Ritchie* and the instant case, the *Ritchie* rule's application here could not be considered "new" because of its application to a novel factual setting. *See Butler v. McKellar,* 494 U.S. 407, 414–15, 110 S.Ct. 1212, 1217, 108 L.Ed.2d 347 (1990). The clearest indication that it is not a "new rule" in the sense contemplated by *Teague* is that the North Carolina courts have demonstrably been fully aware of it and its imperatives from the outset of its specific announcement in *Ritchie. See, e.g., State v. Bailey,* 89 N.C.App. 212, 365 S.E.2d 651, 657 (1988) (recognizing *Ritchie*'s authority and on its basis conducting appellate *in camera* review of agency records sufficiently identified by "plausible showing" by accused).

### IV

■ There remains the problem of remedy for the violation we have found clearly established on our *de novo* review of the district court's judgment dismissing the petition. The right so far denied Love is, as we have shown, only the right to have an *in camera* judicial inspection made of those records and materials "plausibly shown" by Love to meet *Ritchie*'s requirements. These are all the records originally identified by Love to Judge Stephens at the hearing on Love's pretrial motion for discovery of *Brady* materials and later made the subject of subpoenas duces tecum. Specifically, they are the complete medical file of the minor maintained by the Wake Medical Center as of June 19, 1989; ³ the complete medical file and reports concerning the minor maintained by the Wake County Mental Health Center as of June 19, 1989; all records related to the

---

nas quashed and the basis for quashing them." J.A. 86 (district court's order dismissing petition).

2. As indicated in note 1, *supra,* there remains confusion on the state court record as to the actual basis for the order quashing all the subpoenas. The district court concluded, recognizing the difficulty, that all were quashed as "overbroad." J.A. 87. The district court then thought that this raised only a question whether, under state law, the overbreadth ruling was an abuse of discretion and held, applying state law, that it was not. J.A. 89–90. This, of course, was not

the issue raised by Love's constitutional challenge, and the mere fact that a quashal might have been proper under state law would not be dispositive of the quite different constitutional issue.

3. Some, but possibly not all, of Wake Medical Center's records were voluntarily turned over to the defense well in advance of trial. *See* Part I, *supra.* These obviously need not be subjected now to inspection for materiality and favorability, having already been directly disclosed to the accused.

minor maintained by the Wake County Department of Social Services as of June 19, 1989; and all tapes, notes and records concerning Counselor Kim Crews' interview with the minor in March 1988.[4] Not subject to *in camera* inspection are the public school records of the minor as subpoenaed from the custodian of those records; Love has never made to any judicial officer the required showing of how these records might be material and favorable to his defense.

We might provide the required remedy at this stage by either of two means. We could defer remedy, or direct that the writ now issue conditioned in either event upon the state's provision of a proper *in camera* inspection of the records identified, followed by a properly reviewable determination whether any portions qualified for disclosure to the accused as material and favorable to his defense, and for a new trial if they were determined to be so.

Alternatively, we could remand to the district court with directions to secure the identified records, employing such coercive processes as are necessary, to make the reviewable determination required by *Ritchie,* and to then take whatever further remedial or other action that might be required by virtue of the inspection. *See* 28 U.S.C. § 2243 ("as law and justice require").

Courts of Appeals, dealing with comparable situations, have gone both routes. *See, e.g., Miller v. Dugger,* 820 F.2d 1135 (11th Cir.1987) (remand to federal district court for *in camera* inspection of secret grand jury testimony); *Exline v. Gunter,* 985 F.2d 487 (10th Cir.1993) (federal habeas corpus proceeding held in abeyance to allow state trial court to review agency files *in camera* ).

For reasons well-illustrated in the awkward unfolding of the *Exline* procedure, which resulted in a United States District Court directly reviewing the state trial court's materiality determination with no in-

tervening state court appellate review, *see id.* at 491, we opt for the latter course.

Accordingly, we will vacate the judgment of the district court dismissing the petition, and remand to that court for further proceedings as now instructed.

The court should secure the materials we have identified as those to which the petitioner has sufficiently shown a right to *in camera* inspection, either by voluntary production by the state or by such processes of the court as are required. The court should then inspect the materials *in camera* and make the determination required by *Ritchie,* sealing the materials inspected for such appellate review as may be required. The court should then take such remedial or other action as is required by its determination. If the court determines that the agency records we have identified contain information that probably would have changed the outcome of Love's trial, the writ should issue, either absolutely or conditioned upon the state's providing a new trial, as the district court deems proper. If the materials contain no such information or if the nondisclosure was harmless beyond a reasonable doubt, the court will be free to reinstate its dismissal of the petition. *See Ritchie,* 480 U.S. at 58, 107 S.Ct. at 1001–02 (directing comparable remedial proceedings in remanding to state court on direct appeal).

*SO ORDERED*

---

**4.** These records, though possibly included in Wake Medical Center records, were separately identified as records subject to inspection because of the sensitive character of Counselor Crews' interview of the minor immediately after the charged incident. If they exist, they should be included in the inspection. The fact that Counselor Crews testified and was subject to cross-examination at trial does not avoid that necessity, though it could well affect the assessment of their materiality.