IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA24-855

Filed 16 July 2025

Rockingham County, Nos. 11CRS050300-780; 11CRS050301-780; 11CRS050518-780; 11CRS050124-780

STATE OF NORTH CAROLINA

v.

FRANK CATALDO

Appeal by Defendant from order entered 9 December 2022 by Judge Edwin G. Wilson, Jr., in Rockingham County Superior Court. Heard in the Court of Appeals 9 April 2025.

> *Attorney General Jeff Jackson, by Special Deputy Attorney General Sherri Horner Lawrence, for the State-Appellee.*
>
> *Christopher J. Heaney for Defendant-Appellant.*

COLLINS, Judge.

Defendant Frank Cataldo appeals from an order denying his motion for post-conviction discovery and asks this Court to review sealed records to determine whether the records are material and, if so, to grant Defendant a new trial. After a meticulous review of the sealed records, we determine that they are not material. Accordingly, the trial court did not err by denying Defendant's motion for post-conviction discovery.

## I. Background

On 7 March 2011, a Rockingham County grand jury indicted Defendant on two counts of statutory sexual offense and two counts of statutory rape of a minor, T.B.[1] The case proceeded to a jury trial on 6 May 2013. At trial, Defendant sought to introduce evidence of T.B.'s prior allegations of sexual abuse under North Carolina Rule of Evidence 412. The trial court held an in camera hearing to determine the admissibility of the Rule 412 evidence and ultimately excluded the preferred evidence. During the cross-examination of the State's expert witness, Dr. Gina Abbruzzi Martin, Defendant sought to introduce evidence of T.B.'s excessive masturbation and prior allegations of sexual abuse. After another in camera hearing, the trial court allowed Defendant to elicit testimony from Dr. Martin that T.B.'s mother told her that T.B. engaged in excessive masturbation but excluded any evidence of T.B.'s prior allegations of sexual abuse.

The jury found Defendant guilty of two counts of statutory sexual offense and one count of statutory rape; it acquitted Defendant on the other charge of statutory rape. The trial court consolidated the statutory sexual offense convictions, and it sentenced Defendant to consecutive sentences of 240-297 months in prison for the statutory sexual offense convictions and 240-297 months in prison for the statutory rape conviction. Defendant gave notice of appeal in open court and argued on appeal

---

[1] We use a pseudonym to protect the identity of the minor child. *See* N.C. R. App. P. 42.

that the trial court erred in excluding evidence of T.B.'s prior allegations of sexual abuse; this Court found no error on 3 June 2014. *See State v. Cataldo*, 234 N.C. App. 329 (2014) (unpublished) (*Cataldo I*).

On 7 July 2015, Defendant filed a motion for appropriate relief ("MAR") and a motion for post-conviction discovery, pursuant to *Pennsylvania v. Ritchie*, 480 U.S. 39 (1987), in Rockingham County Superior Court; the trial court denied both motions by written order on 5 October 2016. Defendant filed a petition for writ of certiorari with this Court on 9 August 2017; we granted the petition. On 18 September 2018, this Court filed an unpublished opinion reversing the trial court's order denying Defendant's motion for post-conviction discovery and remanding the case to the trial court to conduct an in camera hearing "to determine whether the evidence was material, and whether its exclusion prejudiced [D]efendant's case." *State v. Cataldo*, 261 N.C. App. 538 (2018) (unpublished) (*Cataldo II*). This Court declined to address Defendant's MAR that was denied by the trial court. *Id.*

On 18 December 2018, the trial court ordered the State of North Carolina and Rockingham County Department of Social Services ("Rockingham DSS") to "make available to this [c]ourt the DSS records at issue, specifically records regarding T.B.'s allegations of prior abuse by her father from 2000-2001, and again in 2008, and by her uncle in 2009." It also ordered the State and Rockingham DSS to inform the trial court if they did not have the records and to disclose to the trial court the names of any agencies or counties that did have the records. Rockingham DSS reported to the

trial court that it "did not respond to any abuse, neglect or dependency reports regarding [T.B.] in 2000-2001, 2008 or 2009." Rockingham DSS reported that "the Central Registry indicates that Guilford County Department of Social Services [Guilford DSS] responded to abuse and/or neglect reports on the victim child on or around these time periods." Rockingham DSS provided the trial court with copies of records in their possession regarding Guilford DSS's involvement with the family in 2001 and 2002.

On 18 February 2019, the trial court ordered Guilford DSS to "make available to this [c]ourt the DSS records at issue, specifically records regarding T.B.'s allegations of prior abuse from 2000-2001, 2008, and 2009." It ordered Rockingham DSS and Guilford DSS to inform the trial court if they did not have possession of the described records and to report the names of any agencies or counties that have possession of the described records. Rockingham DSS reported that it "did not respond to any abuse, neglect, or dependency reports regarding the victim child in 2000-2001, 2008, or 2009." Guilford DSS provided records to the trial court.

The trial court conducted an in camera review of the records provided by Guilford DSS and denied Defendant's motion for post-conviction discovery by written order entered 17 June 2019. The trial court concluded that Defendant was not entitled to T.B.'s records containing prior allegations of abuse and that, "in the context of the entire record, there is not a reasonable probability that the outcome of [D]efendant's trial would have been different had he been able to access these

records." It further concluded that "T.B.'s prior allegations of abuse are not material to the defense." Defendant filed a petition for writ of certiorari with this Court on 29 May 2020, asking that we review the trial court's order denying his motion for post-conviction discovery. This Court allowed the petition "for purposes of reviewing [the trial court's] order denying [Defendant's] motion . . . upon the in camera review ordered by this Court in [*Cataldo II*]."

On appeal, this Court held that "[t]he trial court erred when it impermissibly narrowed the scope of its orders to Rockingham [DSS] and Guilford DSS to include only records regarding allegations of events during certain time periods and against certain persons." *State v. Cataldo*, 281 N.C. App. 425, 434 (2022) (*Cataldo III*). This Court reversed the trial court's order and remanded the case to the trial court with instructions to order Rockingham DSS and Guilford DSS "to produce T.B.'s social services records regarding prior claims of abuse." *Id.* (quotation marks and citation omitted).

On remand, the trial court ordered Rockingham DSS, Guilford DSS, and Davidson County Department of Social Services ("Davidson DSS") to provide all records pertaining to T.B. Davidson DSS did not have any records pertaining to T.B. At Defendant's request, the trial court also requested records from a forensic interview completed at the Help, Inc./Kaleidoscope Child Advocacy Center and conducted an in camera review of the records. The trial court entered an order on 9 December 2022 concluding that DSS's records discussing T.B.'s prior allegations

"qualify as favorable evidence, because, while the records do not exculpate Defendant, the records potentially may have adversely affected T.B.'s credibility." However, the trial court further concluded that, "in the context of the entire record, there is not a reasonable probability that the outcome of Defendant's trial would have been different had he been allowed access to these records." The trial court concluded that T.B.'s records were favorable but not material to Defendant's defense or punishment, and it ultimately denied Defendant's motion for post-conviction discovery.

On 17 October 2023, Defendant filed a petition for writ of certiorari with this Court, asking that we review the trial court's order denying his motion for post-conviction discovery. This Court granted the petition on 11 April 2024.

## II.    Discussion

Defendant asks this Court to review all of the sealed records provided by various entities to determine whether the records are material.

On appeal from a trial court's denial of a defendant's request for disclosure of sealed records, this Court reviews the records to determine whether they contain "information that is favorable and material to defendant's guilt or punishment." *State v. McCoy*, 228 N.C. App. 488, 492 (2013) (brackets and citation omitted). "In doing so, we review the trial court's determination de novo." *Id.* (italics and citations omitted). Under de novo review, this Court "considers the matter anew and freely substitutes its own judgment for that of the [trial court]." *State v. Williams*, 362 N.C. 628, 632-33 (2008) (quotation marks and citations omitted). "If the sealed record[s]

contain evidence which is both favorable and material, defendant [is] constitutionally entitled to disclosure of this evidence." *McCoy*, 228 N.C. App. at 492 (citation omitted).

Favorable evidence "tends substantively to negate guilt [and] also . . . tends to impeach the credibility of a key witness for the prosecution." *Love v. Johnson*, 57 F.3d 1305, 1313 (4th Cir. 1995) (citations omitted). Material evidence "is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Ritchie*, 480 U.S. at 57 (citation omitted). "A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Id.* *Ritchie* only requires the trial court to disclose to the defendant evidence that is both favorable and material to the defendant's guilt or punishment. *Id.* at 58.

Here, the voluminous sealed records contain details on a single instance which potentially may have tended to impeach the credibility of T.B., a key witness for the prosecution. *See Love*, 57 F.3d at 1313. While this evidence was potentially favorable, there is no "reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different[,]" and thus the records here are not material. *Ritchie*, 480 U.S. at 57 (citation omitted). The State presented ample evidence, including but not limited to physical evidence of sexual abuse and expert testimony about that sexual abuse, to support Defendant's convictions.

T.B. testified that Defendant began having sex with her in August 2010 and had sex with her "a lot of times" by putting his penis into her vagina. T.B. testified that Defendant would ejaculate "white stuff" in her mouth and onto the bed sheets. Defendant made her perform fellatio on him and he ejaculated "white stuff" into her mouth, and then he made her spit the "white stuff" out of her mouth onto a washcloth. Defendant would wash the washcloth and bedsheets after engaging in sex acts with T.B.

In January 2011, when T.B. was in the eighth grade, she attempted to tell her mother that she was having sex with Defendant by asking her mother "[i]f a 41-year-old man can have sex with a 13-year-old girl." Defendant was 41 years old at the time. Her mother told her no and thought that T.B. had come up with the idea from a sex education class that she was taking at school. T.B. then told her school's guidance counselor that she had been having sex with Defendant and was worried that she was pregnant. The counselor reported the allegations to Rockingham DSS. Ms. Jacqueline Strand with Rockingham DSS received the report and contacted the Eden Police Department.

Detective Ronnie Markham with the Eden Police Department testified that he and Ms. Strand met with T.B. on 14 January 2011, and T.B. told him that Defendant "has been doing things to [her]" and that he put his penis in her vagina and her mouth several times. T.B. was "upset and teary-eyed when she talked with" Detective Markham and Ms. Strand. Detective Markham and Ms. Strand met with T.B.'s

mother and Defendant and told them about the sexual abuse allegations. T.B.'s mother replied that T.B. had a "mild disability" and some delays; Defendant responded that T.B. was probably having sex at school behind the building or in the hallways. Defendant also told Detective Markham that a physical exam of T.B. would "probably show that she had been having sex at school but not with him." Defendant described T.B. and her mother as being "slow" and "retarded."

On 31 January 2011, T.B. was forensically interviewed by Kimberly Madden at the Help, Inc./Kaleidoscope Child Advocacy Center. Madden testified at trial as "an expert in the area of forensic interviewing of children" and portions of the recorded forensic interview were admitted at trial for illustrative and corroborative purposes and published to the jury. Madden testified that T.B. was "developmentally delayed" and "functions on a much lower level than would an average 14-year-old child" but that "her communication ability, as far as talking about her experiences, was adequate for the interview." Madden explained that T.B. had difficulty "accurately report[ing] time" such that she was not "sure of exact dates" but explained that this was due to T.B.'s developmental delays and that T.B.'s "ab[ility] to describe her experiences . . . was adequate for the purposes of the forensic interview."

Madden's written report of the forensic interview was also admitted into evidence. Madden's report stated that T.B. "could respond to questions about her current circumstances, events within the last year, and . . . could differentiate between a truth and falsehood." T.B. disclosed that she "[did not] want to tell" on

Defendant because she "want[ed] him back in the house[,]" but then admitted that "[she] and [Defendant] did it." T.B. disclosed that they had oral and vaginal sex multiple times and that it happened while her mother was working. T.B. said that she liked Defendant and that having sex with him made her feel "happy" and that she was sad Defendant was in jail.

On 18 February 2011, Dr. Martin conducted a medical physical examination of T.B. Dr. Martin noted that T.B. had "some developmental delay issues" and "seemed like she was younger than she was." Dr. Martin noted that T.B. had a "transection defect" to her hymen and "a lot of swelling to her hymen." Dr. Martin testified:

> Well, she actually had a lot of swelling in her hymen, but it was still evident that there was what we would call in medical lingo a transection, which just means -- if you think about that scrunchie as being circular, when you look at one edge of it at the bottom, there was actually a split in it. So there was basically a line or a hole kind of going through it to the vagina, to the vaginal wall . . . .

Dr. Martin explained that this defect was "not something [T.B. would] be born with" and that "that would not be a hymen that somebody would be born with." Dr. Martin opined that T.B.'s hymenal defect "is really indicative of vaginal penetration." Dr. Martin further explained that T.B.'s hymenal injury, while impossible to date exactly, was "probably greater than a week old" and the "transection is consistent with a penetrating injury" as opposed to masturbation. Dr. Martin also testified about T.B.'s masturbation, which T.B.'s mother reported as occurring on a daily basis, and stated that "most children do masturbate to some extent, which is considered normal human

behavior. But when a child starts masturbating daily or several times a week, it's -- often it's indicative of some type of abuse."

Dr. Martin's Child Medical Evaluation Report was also submitted as evidence at the trial. The report states that Defendant has "engaged in oral sex and vaginal intercourse with [T.B.] since the Summer of 2010" and that T.B. had disclosed the sexual abuse to her mother, her teacher at school, a social worker, and a police officer. The report states that T.B. began having sex with Defendant in August 2010 and that Defendant "was helping her to know what to do when she got a boyfriend." T.B. reported that she was "very sad that [Defendant] was in jail" and that "[s]he misses [Defendant] and he is the only one who can help her with her math homework." T.B. told law enforcement and a social worker that "the sex made her happy" and "[s]he would like to run away with [Defendant] and have his baby." She reported to her teacher that Defendant "would pull out and ejaculate on her stomach." The report also states that T.B.'s mother found letters that T.B. had written stating that she would like to run away with Defendant and have his babies. T.B.'s mother reported that she "believed [the sexual abuse] occurred because she did recently find the letters" and she described Defendant and T.B. as "close."

Dr. Martin conducted a limited interview of T.B. during the child medical exam. T.B. told Dr. Martin that she was sad Defendant was in jail, and she knew he was in jail because they "had sex." T.B. said they "had sex" in January, after Christmas break, and that it happened on "a snow day with a 2 hour delay." She

described where her mother and siblings were when the sex occurred and explained that Defendant "pushed [her] face down on the bed" and "pulled his pants down and got on top of [her]." Defendant "put it in [her] hole" and "pulled his thing out [of her] so that white stuff wouldn't get in [her]." She reported that this happened "20-30" times and that she never told anyone because "[Defendant] said it was our secret."

Following her interview and physical examination of T.B., Dr. Martin made a diagnosis that "[t]here is a high likelihood that [T.B.] has been sexually abused by [Defendant]. [T.B.] is very 'matter of fact' when she tells of their sexual relationship. She reports that she loves him and that she is very upset that he is in jail. She has nothing to gain by telling her story and, in fact, she has in her mind experienced a significant loss." Dr. Martin's report further found that "[T.B.] is also very developmentally delayed and I'm not certain that she has the capacity to be dishonest or manipulative. The patient has physical findings suggestive of vaginal penetration. She had a large amount of hymenal edema during the exam, but she also appeared to have a transection of the hymen at 8 o'clock. . . ."

Given the paucity of favorable evidence in the sealed records and the ample evidence of Defendant's guilt presented at trial, there is no reasonable probability that, had the evidence of T.B.'s prior allegations of sexual abuse been disclosed to Defendant, the result of the proceeding would have been different.

### III. Conclusion

In light of the evidence presented at trial, including the physical evidence of

sexual abuse of T.B. and expert testimony about that sexual abuse, we determine that the sealed records are not material to Defendant, as there is not a "reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Ritchie*, 480 U.S. at 57 (citation omitted). For the foregoing reasons, the trial court did not err by denying Defendant's motion for post-conviction discovery.

NO ERROR.

Judges HAMPSON and CARPENTER concur.