Lesly JEAN, Petitioner–Appellant,

v.

Nathan A. RICE, Warden; Lacy Thornburg, Attorney General of North Carolina, Respondents–Appellees.

No. 90–6621.

United States Court of Appeals, Fourth Circuit.

Argued March 8, 1991.

Decided May 22, 1991.

As Amended June 21, 1991.

Publication Ordered Aug. 20, 1991.

---

Paul M. Green, North Carolina Prisoner Legal Services, Inc., Raleigh, N.C., argued, for petitioner-appellant.

Richard Norwood League, Sp. Deputy Atty. Gen., argued (Lacy H. Thornburg, Atty. Gen. of N.C., on brief), Raleigh, N.C., for respondents-appellees.

Before WIDENER and SPROUSE, Circuit Judges, and WARD, Senior District Judge for the Middle District of North Carolina, sitting by designation.

PER CURIAM:

Defendant, Lesly Jean, was convicted of rape and sexual assault after trial by jury in North Carolina state court and sentenced to two consecutive life terms. After exhausting his state court appeals and post-conviction remedies, he filed a petition for a writ of habeas corpus in federal district court, contending that his conviction was based on the use of hypnotically enhanced testimony that violated his rights under the Sixth and Fourteenth Amendments and that the state failed to disclose the audio recordings and reports of the involved hypnosis, despite a specific request for such material, in violation of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). The district court denied the writ. We reverse.

### I

In the early morning of July 21, 1982, Ms. Alice "Kathy" Wilson was raped and sexually assaulted. The incident occurred between 3:00 and 4:15 a.m. Ms. Wilson described her attacker as black, five feet eight inches tall, muscular, weighing about 165 or 170 pounds, with a close-cut marine haircut, kinky hair, and no facial hair. She added that he wore dark shorts, white crew socks and high-top sneakers. Ms. Wilson, however, acknowledged that she did not realize that her attacker was black until he told her.

Later that same morning, Officer James Shingleton stopped a man walking along the highway who fit the description of Wilson's assailant. He questioned the man for about one-and-one-half minutes, until the man fled into the neighboring woods. Shingleton did not get a good look at the suspect, as it was still nightfall and the only light available was from his police car's flashing blue lights. Shingleton described the person as a black male, possibly having a beard or mustache, close-cut hair, about five feet ten inches tall, 170 pounds, wearing blue shorts, a blue shirt with writing, white knee socks and white high-top tennis shoes.

The following morning, Ms. Wilson met with police officials to create a "composite" drawing of the suspect, which was subsequently reproduced and immediately circulated throughout the police station.[1] Police officials, however, decided not to reproduce a composite drawing based on Shingleton's description because the encounter had been too brief, the lighting too poor, and his description too vague.

---

1. At this meeting, Wilson added to her previous description that her attacker had small freckles scattered over his upper face, as well as a large spot somewhere on his left cheek, approximately the size of a dime.

Because of the shortcomings in Shingleton's description, Captain Collins, head of the Detective Division, hypnotized Shingleton on July 22, 1982. Collins' only training in this area had been a two-week course in investigative hypnosis at the North Carolina Justice Academy. During the hypnotic session, Shingleton's description of the man he stopped changed from his previous description. The design on the tee shirt became a sweat mark and the man was now clean-shaven. Shingleton also now remembered that the suspect had a baby-face, oval jaw, big lips, a big nose, glassy eyes [2] and that there were blue stripes on his socks, white shoelaces, and the word "Nike" written on the sneakers. Collins audio taped the actual hypnosis, but he did not tape the pre- and post-hypnotic conversations. He also did not record his own knowledge of the case, nor did he record Shingleton's pre- and post-hypnotic knowledge.[3] Afterward, Shingleton emphasized that he believed that the hypnosis greatly helped his memory and that he had actually "relived" the night in question. Investigating officers concluded that, as a result of the hypnosis, Shingleton's "description matches the one given by [the] victim."

On July 26, 1982, two police officers spotted Jean at a Dunkin' Donuts restaurant, located near the victim's home. Believing that Jean matched the description of Wilson's assailant, the two officials detained Jean and radioed for Shingleton to come view him. Shingleton arrived, and positively identified Jean as the person he had stopped, stating, "that is the man." Jean was then taken into custody, photographed, fingerprinted and his marine locker searched—all acts which Jean consented to. The search of Jean's locker uncovered a blue tee shirt, a blue pair of shorts with a white border and white stripes on each side, and a pair of white high-top basketball sneakers, with the Nike name and logo inscribed in black, and black laces in the sneakers. Shortly thereafter, Jean was released.

The next day, July 27, 1982, Ms. Wilson viewed a photo line-up, which included Jean's picture. She could not identify any of the subjects as her rapist. Ms. Wilson, however, returned to the police station the next day because one of the pictures made her "feel sick." She again viewed the photos and selected Jean's photo, saying that his was the face that made her feel sick. She also selected another photo, saying that the person in that photo looked "haunty." Wilson could not, however, make a positive identification of Jean as her assailant. During that same meeting, police showed Ms. Wilson the clothes that had been removed from Jean's locker, but she apparently did not recognize them.[4]

On July 30, 1982, Captain Collins hypnotized Ms. Wilson to "improve her memory of why [the] picture makes her sick." When Collins asked her if she had ever seen the person in the photo that made her ill, she replied that she did not know. He then asked if the picture and the rapist "looked the same? especially the eyes?, shape of face?" She replied "yes." [5]

---

**2.** Shingleton, however, stated during deposition testimony that he could not observe whether the suspect's eyes were glassy or clear. Further, one of the investigating officers stated that "both [witnesses] saw the man under conditions of extremely reduced light or extremely poor light, one being a color variation [Shingleton], the other being slight lighting [Wilson]. And the two tried to adjust what they saw based on what they believed."

**3.** Shingleton could not recall whether or not he had seen the composite drawing created from Ms. Wilson's description prior to the hypnosis.

**4.** The investigating officer stated that had Wilson recognized the clothing, he would have indicated it in his report, which he did not.

**5.** The parties dispute whether Wilson positively identified Jean's picture as her attacker during the hypnosis. The colloquy between Collins and Wilson went as follows:

Collins: Now Kathy, you're going to go back to this photograph now. Let your mind travel back very easily and slowly to the photograph that you described earlier.
The one photograph that causes you to be ill and I'm going to ask you to be very honest with me, you're safe and secure now. Have you ever seen the eyes in that photograph before? [Long pause] You're safe and secure Kathy. As a matter of fact I'm going to go even further now. You're safer than you've ever been. No harm can possibly ever come to you again. You're with friends. Now I want you to tell me—the face of the man in

Again, Collins audio taped only the actual hypnosis, though this time he filled out a "Pre–Hypnosis Information Worksheet," briefly listing the characteristics of the assailant that the victim was able to describe at that time. After the hypnotic session, Collins filled out a "During Hypnosis Information Worksheet," circling the items of "new information" as (1) a description of the assailant's eyes as grey, (2) possible Puerto Rican accent, (3) Nike emblem on his shoes, and (4) white shoelaces.

On August 3, 1982, the police made a voice exemplar tape, which included Jean's voice, along with four other voices—two with a northern United States accent, one with a Guamanian accent and the final one with a Puerto Rican accent. Jean, who was born in Haiti and spent part of his life there, has a Creole accent, which is a mixture of French and African dialects. Wilson stated that Jean's voice and the Puerto Rican voice sounded similar to the voice of her assailant, but she could not make a positive identification. One week later, Wilson telephoned the police and, without having listened to the tapes again, purported to identify Jean's voice as that of her assailant.

Six weeks later, on September 17, 1982, the police had Wilson view a three man line-up, which consisted of Jean and two other black men. One of the men was taller, the other shorter, than Jean. Neither possessed a military haircut and defendant's face is the only one which appeared in each photo identification as well as the live line-up. After viewing the line-

up, Wilson positively identified Jean as her attacker.

In October 1982, Jean was indicted on charges of rape and sexual assault. Counsel for defendant filed a timely motion for discovery, which included the following request:

> To disclose the facts and circumstances surrounding any ... pre-trial identification ... at least sufficient to allow the defendant to determine whether to proceed under N.C.G.S. 15A–977 [governing motions to suppress evidence].

> To permit the defendant to inspect and copy ... mechanical or electronic recordings, tangible objects, or copies or portions thereof ... which are material to the preparation of his defense....

> To provide ... results or reports of physical or mental examinations or of tests, measurements or experiments made in connection with the case....

Despite this request, the state did not inform defense counsel that the victim may have identified Jean's photograph, that the two key witnesses had been hypnotized, or that various records pertaining to hypnosis and identification procedures existed. In fact, defense counsel did not learn of the hypnosis until after trial had already started, and after Ms. Wilson had already testified on direct examination.[6] After learning of the hypnosis, counsel requested any recordings that might exist—inexplicably the state still did not provide its records or tapes. Though defense counsel cross-examined both Ms. Wilson and Officer Shingleton on the possible effects of the hypno-

your bedroom [door slam] [is (?) ] the same as the photograph that you are now looking at in your mind's eye, of the photograph that you saw when shown to you by Detective Smith ___, was it the same face?
Wilson: [Wouldn't be surprised./Wouldn't be so ___. (?) ]
Collins: Do the pictures appear to be the same? Especially the eyes? The shape of the face?
Wilson: Yes.
Collins: Do you believe that the photograph and the man in your bedroom were one and the same?
Be very honest with us. No body's [sic] going to hurt you any further.
Wilson: [They look the same (?) ]

The question marks indicate where Wilson's answers cannot be discerned because of the very poor quality of the audiotape. However, the tape suggests that Ms. Wilson more strongly associated Jean as her rapist during the hypnosis than she had done at any time prior to hypnosis.

6. During the hearing on Jean's Motion for Appropriate Relief, Jean's trial counsel recounted how he learned of the hypnosis, stating: "[a]fter [Ms. Wilson] testified on the merits, there was some discussion between ourselves and the Assistant District Attorney about a statement as well as the fact that she had been hypnotized; and that's when I first found out; the case had started."

sis, he did not have the recordings to help contradict the witnesses' testimony or to demonstrate the pervasive procedural flaws in the hypnosis.

The state's evidence consisted of Jean's sneakers, shorts and tee shirt, a blood/semen test that placed him in the same 32% of the population as the rapist, and the identification testimony of Wilson and Shingleton, who both identified Jean at trial, though Shingleton acknowledged that he could not be absolutely certain. In his own defense, Jean offered four alibi witnesses. Three marines testified that they awakened Jean in his bunk or saw him there at the time the victim was assaulted. The fourth witness, Jean's platoon commander, testified that Jean was required to be on duty at that time, and that if Jean had not been present there would have been a record of his absence, which there was not.

On December 5, 1982, the jury returned a guilty verdict on all four counts. The trial court sentenced Jean to two consecutive life terms in prison and the North Carolina Supreme Court affirmed the conviction. *State v. Jean*, 310 N.C. 157, 311 S.E.2d 266 (1984). After exhausting his state appeals and being denied post-conviction relief, Jean filed a petition for writ of habeas corpus in the United States District Court for the Eastern District of North Carolina. Though the magistrate judge recommended that the writ should issue, the district court, conducting a *de novo* review, denied the writ. It is that judgment we review.

## II

The dangers inherent in hypnotically enhanced testimony have been widely recognized.[7] In *Rock v. Arkansas*, 483 U.S. 44,

59–60, 107 S.Ct. 2704, 2713, 97 L.Ed.2d 37 (1987), the Supreme Court stated:

Three general characteristics of hypnosis may lead to the introduction of inaccurate memories: the subject becomes "suggestible" and may try to please the hypnotist with answers the subject thinks will be met with approval; the subject is likely to "confabulate," that is, to fill in details from the imagination in order to make an answer more coherent and complete; and, the subject experiences "memory hardening," which gives him great confidence in both true and false memories, making effective cross-examination more difficult.

The Supreme Court added that these dangers can be "reduced, although perhaps not eliminated, by the use of procedural safeguards." *Id.* at 60, 107 S.Ct. at 2713. In *State v. Hurd*, 86 N.J. 525, 432 A.2d 86 (1981), the New Jersey Supreme Court enumerated six procedural safeguards for hypnotic sessions.[8] The court stated that, first, the hypnotic session must be conducted by a psychiatrist or psychologist trained in the use of hypnosis. Second, the session must be independent of the police investigation, the prosecution and the defense. Third, the hypnotist's knowledge of the facts in the case should be recorded. Fourth, before hypnosis, the hypnotist should obtain a detailed description of the subject's current memory of the event. Fifth, the hypnosis session should be recorded—video taping is strongly recommended—so a permanent record exists to ensure against suggestive procedures. Finally, only the hypnotist and the subject should be present during any phase of the hypnotic session, including the prehypnotic

---

7. In *State v. Peoples*, 311 N.C. 515, 319 S.E.2d 177, 188 (1984), the North Carolina Supreme Court ruled that hypnotically refreshed testimony is inadmissible in judicial proceedings. However, the court in *Peoples* stated that the new rule would not apply retroactively to any case which had been finally determined on direct appeal or in which no appeal was taken from the trial court judgment. *See id.*, 319 S.E.2d at 189. Thus, because Jean's state court appeal had been denied several months prior to the decision in *Peoples*, he could not avail himself of this change in the law.

8. Although we have not adopted the *Hurd* guidelines as a "litmus test" for determining the reliability of pre-trial hypnosis, we have stated that they "certainly represent the type of general reliability inquiry that must be made" and that each of the six potential safeguards suggested in *Hurd* is relevant to the review of hypnotic procedures. *McQueen v. Garrison*, 814 F.2d 951, 958 (4th Cir.1987).

testing and the posthypnotic interview. *Hurd*, 432 A.2d at 96–97.

■■■■ The district court found that the hypnosis conducted by Captain Collins "complied with none of these procedures," save the audio taping of the hypnosis, and that "there is no question that the procedures ... were inadequate and deficient." It concluded, however, that because the hypnosis was disclosed in adequate time for defense counsel to make use of it at trial, no constitutional violation occurred. The district court, though, did not sufficiently weigh the *Brady* consequences of the state's failure to provide the tape recordings and records. *See Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). In our view, the failure to furnish the requested evidence was constitutionally prejudicial. *Brady*, of course, held that the suppression of evidence "favorable to the accused upon request violates due process where the evidence is material either to guilt or to punishment...." *Brady*, 373 U.S. at 87, 83 S.Ct. at 1196–97. Evidence is "material" when "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985).

Jean contends that the evidence concerning the hypnosis is material evidence under *Brady*. We agree.[9] Apart from the identifications, there was little independent corroborating evidence to sustain Jean's conviction: there were no fingerprints or matching pubic hairs; the blood/semen test only placed Jean in the same 32% as the rapist; and the voice exemplar was of dubious quality, had only one black voice on it, and presented difficulty to Ms. Wilson,

causing her to take one week to make her identification. Consequently, Jean's conviction rests substantially on the witness identifications, which makes disclosure of the recordings all the more critical. Had defense counsel had the audio recording and accompanying reports, it could have used that evidence to discredit the testimony of Ms. Wilson and Officer Shingleton. Despite Ms. Wilson's contention that the hypnosis had no effect on her, the audio recording suggests that it may have been during hypnosis that Ms. Wilson first identified Jean as her assailant.[10] Similarly, we think the audio tapes and accompanying records were material as evidence having strong potential for impeaching Shingleton's testimony. The stripe on the tee shirt that Shingleton thought he saw became a sweatmark under hypnosis. The mustache disappeared entirely. Under hypnosis, Shingleton recalled white shoelaces, but Jean's were black; he recalled striped socks, but Jean's were not; he recalled shorts with no stripes, but Jean's shorts had stripes and white trim; and he recalled glassy eyes, but in deposition testimony stated that he could not see the suspect's eyes clearly.

We are persuaded that the audio recordings and accompanying reports—twice requested—should have been disclosed to defense counsel, and that the government's failure to do so was a violation of the principles announced in *Brady* and its progeny.[11] Accordingly, the judgment of the district court is reversed and the case remanded with instructions to issue the writ of habeas corpus. Unless the state elects to retry the defendant within a reasonable time, he should be released.

REVERSED AND REMANDED.

---

9. Impeachment evidence as well as exculpatory evidence, of course, falls within the principles of *Brady*. *See Giglio v. United States*, 405 U.S. 150, 154–55, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972).

10. The district court found that Ms. Wilson's illness at the sight of Jean's photograph was a

"form of association that verges on an identification." We disagree.

11. Because we reverse under the due process principles enunciated in *Brady*, we need not consider Jean's contention that the *use* of hypnotically refreshed testimony also violated his Sixth and Fourteenth Amendment rights.