107 F.3d 1111
 Lesly JEAN, Plaintiff-Appellant,
v.
Delma COLLINS, Chief of Detectives, of the City of
Jacksonville, Individually; James Shingleton, Police
Officer with the City of Jacksonville, North Carolina,
Police Department, Individually, Defendants-Appellees.
 No. 95-7694.
 United States Court of Appeals,
Fourth Circuit.
 Argued Sept. 27, 1996.
Decided March 7, 1997.
 
 Opinion Vacated On Sept. 19, 1997.
 ARGUED: Rebecca J. Britton, Beaver, Holt, Richardson, Sternlicht, Bruge & Glazier, P.A., Fayetteville, NC, for Plaintiff-Appellant. Kenneth Ray Wooten, Ward & Smith, P.A., New Bern, NC, for Defendants-Appellees. ON BRIEF: Richard B. Glazier, Beaver, Holt, Richardson, Sternlicht, Bruge & Glazier, P.A., Fayetteville, NC, for Plaintiff-Appellant. John R. Green, Jr., Ward & Smith, P.A., New Bern, NC, for Defendants-Appellees.
 Before ERVIN and HAMILTON, Circuit Judges, and SPENCER, United States District Judge for the Eastern District of Virginia, sitting by designation.
 Reversed and remanded by published opinion. Judge ERVIN wrote the opinion, in which Judge SPENCER joined. Judge HAMILTON wrote a concurring opinion.
 OPINION
 ERVIN, Circuit Judge:
 
 
 1
 Lesly Jean (Jean) appeals from an order of the district court dismissing his case with a grant of summary judgment. For the reasons set forth below, we vacate the grant of summary judgment and remand for further proceedings in the district court.
 
 
 2
 * Jean brought suit against Captain Delma Collins (Collins), Chief of Detectives of the City of Jacksonville, and Officer James Shingleton (Shingleton), a police officer with the city, for malicious prosecution, false arrest, arrest absent probable cause, and violation of Jean's due process right under Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), to have exculpatory evidence disclosed to defense counsel during a criminal prosecution. These claims were brought pursuant to 42 U.S.C. § 1983 and state law. The state law claims were dismissed prior to the summary judgment stage, and because Jean does not appeal their dismissal, they are not at issue here. Jean's § 1983 claims are related to the government's use of hypnotically-enhanced testimony at Jean's criminal trial for rape and to the prosecution's failure to fully disclose exculpatory evidence related to the hypnosis.
 
 
 3
 The district court granted defendants' motion for summary judgment on the § 1983 claims for several reasons. In his appeal Jean assigns error only to the district court's determination that, as a matter of law, defendants are entitled to qualified immunity on the Brady issue because Jean's right to have the government disclose the evidence regarding the hypnotically-enhanced testimony was not clearly established in 1982. Our review of this grant of summary judgment based on a finding of qualified immunity is de novo because it is a matter of law. Pritchett v. Alford, 973 F.2d 307, 313 (4th Cir.1992).
 
 II
 
 4
 On July 21, 1982, Kathleen Wilson (Wilson) was brutally raped and beaten at her home in the early morning. A police officer arrived, took a very brief description of the perpetrator, and immediately broadcast it on the police radio. Patrolman Shingleton, a defendant in this case, heard the broadcast and stopped a man walking along the highway who fit the description. After a brief encounter, the man fled and was not found again. Later that morning, Shingleton described the man he had seen, but he was unable to provide much detail. At the hospital shortly after the attack, Wilson provided police with a description of her attacker and worked with a sketch artist to create a likeness of the perpetrator. The description provided by Wilson did not match, in many respects, that provided by Shingleton.
 
 
 5
 The next day Collins, then head of the detective division and a defendant in the instant case, decided to hypnotize Shingleton to enhance his memory of the encounter with the suspect on the street. Apparently both officers knew the content of Wilson's description and knew that it differed from Shingleton's description, but it is unclear whether they had also both seen the composite sketch prepared by Wilson and the sketch artist. Collins' formal instruction in hypnosis consisted of a two-week training course; he had conducted several hypnoses for the department and he read publications about hypnosis as an investigative technique. Despite his training, Collins did not take detailed notes or record the hypnosis. He only recorded in his log that the description given by Shingleton after the procedure matched the one given by Wilson.
 
 
 6
 A few days after the attack a police officer in a donut shop encountered Jean, a marine stationed at the military base near Wilson's apartment, and the plaintiff in this case. Believing that Jean resembled one of the descriptions, the officer called Shingleton. Shingleton identified Jean as the man he had seen on the roadside, and he testified later that he was able to identify Jean due to the hypnosis. Jean was placed under arrest.
 
 
 7
 Officer Smith, another officer working on the investigation, showed Wilson a photo lineup with five pictures, one of which was Jean's. She stated that none of the pictures were of her assailant, but said that one photo--not Jean's--made her uncomfortable. The next day she telephoned the officer and asked to see the photo lineup again. This time Wilson said that Jean's eyes made her feel ill, but she did not say that Jean had been her attacker.
 
 
 8
 At this point Collins and Shingleton decided to hypnotize Wilson to enhance her ability to identify her perpetrator's photo.[1] The actual hypnosis was audiotaped, but not the pre- or post-hypnotic conversations and descriptions. Officer Collins did fill out worksheets prior to and after the hypnosis.
 
 
 9
 In the weeks following the hypnosis, Wilson listened to voice exemplars and, after a week's delay and several play-backs, tentatively selected Jean's voice. Wilson also picked Jean out of a three-person lineup.[2]
 
 
 10
 Prior to Jean's trial for rape and sexual assault, his attorneys timely filed a discovery motion requesting, among other things, disclosure of "facts and circumstances" surrounding any pre-trial identification; inspection of recordings tangible to the preparation of his defense; and results and reports of any physical examinations, tests, measurements, and experiments made in connection with the case. Despite this motion, the state did not inform Jean's counsel that the victim had ever seen Jean's photograph prior to the lineup, or that Wilson or Shingleton had ever been hypnotized. Moreover the state did not disclose any of the documentation of the hypnoses and how the descriptions had been affected by them. Not until the victim had testified on direct examination during the trial did Jean's counsel learn of the hypnosis. Even after counsel discovered the hypnosis and requested all records and recordings relating to the procedures, the state still refused to disclose the requested material, denying that any records existed.
 
 
 11
 The jury returned guilty verdicts against Jean on all counts, and he was sentenced to two consecutive life sentences. After exhausting his appeal of right at the state level, and filing for writs of habeas corpus in state courts and in a federal district court, his case came before us. In 1991, we reversed the decision of the district court denying habeas relief and found that the state's failure to turn over evidence relating to the hypnosis and other identification procedures violated Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Jean v. Rice, 945 F.2d 82 (4th Cir.1991) (per curiam). We further found that the evidence at issue had certainly been material, as most of the non-identification evidence presented at trial tended to exculpate rather than implicate Jean. Id. at 87. On that basis we vacated Jean's conviction and remanded for further proceedings. The state declined to try Jean again, and he was released after serving nine years in prison.
 
 III
 
 12
 A government official is entitled to qualified immunity from civil liability under § 1983 when his or her "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). See also Taylor v. Waters, 81 F.3d 429, 433 (4th Cir.1996); Pinder v. Johnson, 54 F.3d 1169, 1173 (4th Cir.1995) (en banc), cert. denied, --- U.S. ----, 116 S.Ct. 530, 133 L.Ed.2d 436 (1995); Pritchett v. Alford, 973 F.2d 307, 312 (4th Cir.1992).
 
 
 13
 The first step in assessing whether a particular official is entitled to qualified immunity involves identification of the specific right which the official allegedly infringed. Taylor, 81 F.3d at 433; Pritchett, 973 F.2d at 312. A court must next determine whether the right was clearly established at the time of the alleged violation. Pritchett, 973 F.2d at 312. These two inquiries are exclusively legal ones. Id. If the first two criteria are met, it must next be decided whether a reasonable person in the officer's position would have known that his or her actions would violate the right. Id. This assessment involves application of an objective test to the particular facts of the case, and jury determinations may be required to settle disputed aspects of those facts. Id. See also Anderson v. Creighton, 483 U.S. 635, 646 n. 6, 107 S.Ct. 3034, 3042 n. 6, 97 L.Ed.2d 523 (1987). We will address each element of the three part test for qualified immunity in turn; if Jean is able to satisfy each prong of the test then Collins and Shingleton are not entitled to qualified immunity from suit.
 
 
 14
 * With respect to the first prong of the test, Shingleton and Collins vigorously argue that Jean has not properly identified the constitutional right violated by the state's failure to disclose the evidence at his trial. We find this argument to be unpersuasive. In our decision to vacate Jean's conviction on habeas review, we plainly held that the state's failure to comply with Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and its progeny violated Jean's constitutional rights. Jean v. Rice, 945 F.2d at 87. Both the Supreme Court and this Circuit, when addressing Brady issues, have grounded a defendant's right to exculpatory evidence in the Due Process Clause of the Fourteenth Amendment. See, e.g., Brady, 373 U.S. at 85; Wise v. Warden, Maryland Penitentiary, 839 F.2d 1030, 1033 (4th Cir.1988); Boone v. Paderick, 541 F.2d 447, 448 (4th Cir.1976), cert. denied, 430 U.S. 959, 97 S.Ct. 1610, 51 L.Ed.2d 811 (1977). More than three decades ago we held that failure of the police to disclose impeachment evidence involves a "question of fundamental fairness rising to the level of constitutional due process which cannot be brushed aside as a mere error in evidentiary ruling." Barbee v. Warden, 331 F.2d 842, 847 (4th Cir.1964).
 
 
 15
 Shingleton and Collins further argue that the Supreme Court's decision in Albright v. Oliver, 510 U.S. 266, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994), means that Jean cannot vindicate his Brady violation through the Fourteenth Amendment. We disagree with this reading of Albright. Albright is an admittedly confusing decision because it lacks a majority opinion; instead it has one plurality and several concurring and dissenting opinions. However, perhaps its clearest, most relevant holding is found in the plurality opinion of Chief Justice Rehnquist:
 
 
 16
 Where a particular Amendment "provides an explicit textual source of constitutional protection" against a particular sort of government behavior, "that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing these claims."
 
 
 17
 Id. at 273 (quoting Graham v. Connor, 490 U.S. 386, 394, 109 S.Ct. 1865, 1871 (1989)).
 
 
 18
 Albright does not preclude Jean's cause of action because the right to disclosure of exculpatory evidence is grounded directly in the Due Process Clause itself. See Brady, 373 U.S. at 86, 83 S.Ct. at 1196 ("We agree with the Court of Appeals that suppression of this confession was a violation of the Due Process Clause of the Fourteenth Amendment."). Language used by Justice Stevens in his dissent in Albright suggests strongly that Brady and Giglio v. United States, 405 U.S. 150, 153-54, 92 S.Ct. 763, 765-66, 31 L.Ed.2d 104 (1972), are examples of the sorts of liberty protections which go beyond the strictly procedural and are therefore properly within the domain of substantive due process. Albright, 510 U.S. 266, 299, & n. 15, 114 S.Ct. 807, 826 n. 15, 127 L.Ed.2d 114 (Stevens, J., dissenting). "Our cases make clear that procedural regularity notwithstanding, the Due Process Clause is violated by the knowing use of perjured testimony or the deliberate suppression of evidence favorable to the accused." Id.
 
 
 19
 We have already recognized that Albright does not preclude causes of action grounded directly in the Fourteenth Amendment. In Taylor v. Waters, 81 F.3d 429 (4th Cir.1996), we stated in a footnote that Albright did not change the fact that an officer's failure to disclose exculpatory evidence deprives a defendant of his or her due process right to a fair trial and can be actionable under § 1983. Id. at 436 n. 5. Specifically, we stated that while Albright rendered part of our previous holding in Goodwin v. Metts, 885 F.2d 157 (4th Cir.1989), cert. denied, 494 U.S. 1081, 110 S.Ct. 1812, 108 L.Ed.2d 942 (1990), invalid, it did not affect the portion of our holding which allowed a § 1983 claim for a Brady violation. For these reasons, Shingleton and Collins are mistaken to rely on Albright in the instant case.
 
 
 20
 We find that Jean has properly grounded his instant claim in the Due Process Clause of the Fourteenth Amendment and that he has satisfied the first prong of the test to determine whether Shingleton and Collins are immune from suit.
 
 B
 
 21
 In deciding whether Shingleton and Collins are entitled to qualified immunity we must next determine whether the specific right infringed was clearly established in 1982. Pritchett v. Alford, 973 F.2d 307, 312 (4th Cir.1992). "In determining whether the specific right allegedly violated was 'clearly established,' the proper focus is not upon the right at its most general or abstract level, but at the level of its application to the specific conduct being challenged." Id.; see also Anderson v. Creighton, 483 U.S. 635, 639-40, 107 S.Ct. 3034, 3038-39, 97 L.Ed.2d 523 (1987); Gooden v. Howard County, Md., 954 F.2d 960, 968 (4th Cir.1992) (en banc). We must, however, strike a balance and avoid defining the right so narrowly, in a manner which is so dependant upon the facts of this very case, that qualified immunity is virtually guaranteed. "Of course, 'this is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful; but it is to say that in the light of pre-existing law the unlawfulness must be apparent.' " Gooden, 954 F.2d at 968 (quoting Anderson v. Creighton, 483 U.S. at 640, 107 S.Ct. at 3039).
 
 
 22
 The district court determined that disclosure of hypnosis-related evidence was not a clearly established right in 1982. Shingleton and Collins, together with the district court suggest that while exculpatory evidence had to be disclosed as early as Brady, impeachment evidence is much different and the requirement of its disclosure did not arise until 1985. We find this analysis to be incorrect for two reasons. First, we believe that appellees draw an artificial bright-line between impeachment and exculpatory evidence. They fail to recognize that the evidence that the eyewitnesses against Jean had their memories enhanced and influenced by hypnosis has both exculpatory and impeachment implications. Certainly the hypnosis could have been used to provide material for cross-examination of the eye-witnesses. It could also have been used to show that, prior to the suggestive procedures, the descriptions given by the witnesses were of a person other than Jean. This aspect makes the evidence exculpatory and not merely relevant for impeachment.
 
 
 23
 More importantly, disclosure of even purely impeachment evidence was required well before 1982. The Supreme Court's decision in Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104, made clear in 1972 that evidence tending to cast doubt upon the credibility of a government witness should be disclosed under Brady:
 
 
 24
 Thereafter Brady v. Maryland held that suppression of material evidence justifies a new trial "irrespective of the good faith or bad faith of the prosecution." When the "reliability of a given witness may well be determinative of guilt or innocence," nondisclosure of evidence affecting credibility falls within this general rule.
 
 
 25
 Id. at 153-54, 92 S.Ct. at 766 (citations omitted). In Giglio the Court went on to find that evidence that a key government witness had been offered immunity from prosecution for his testimony had sufficient bearing on that witness' credibility, and was certainly material to the determination of defendant's guilt, and therefore it should have been disclosed to the defense. Id.
 
 
 26
 Several cases which followed Giglio confirm that it in fact established the right to disclosure of credibility evidence. In Boone v. Paderick, 541 F.2d 447 (4th Cir.1976), cert. denied, 430 U.S. 959, 97 S.Ct. 1610, 51 L.Ed.2d 811 (1977), we found that the existence of a cooperation agreement with a prosecution witness was clearly relevant to the credibility of that witness; that the jury might not have convicted the defendant if they had reason to doubt the credibility of the government's main witness; and that failure to disclose such evidence was a violation of Giglio and Brady. Id. at 448-49. See also Campbell v. Reed, 594 F.2d 4 (4th Cir.1979).
 
 
 27
 Shingleton and Collins raise two arguments attempting to refute the pre-1982 precedent on this issue. They first argue that there was no holding specifically affirming the impeachment value of evidence of hypnosis. The very behavior at issue, however, need not have been specifically addressed by a court for the right to be free from that behavior to have been clearly established. Gooden, 954 F.2d at 968. Moreover, as early as 1969, courts in other jurisdictions had found a duty to disclose evidence relating to hypnosis. In 1969, Judge Friendly of the Second Circuit, granted a new trial in a case in which the prosecutors failed to disclose that the main witness had been hypnotized during the pre-trial investigation. United States v. Miller, 411 F.2d 825, 832 (2d Cir.1969). The reversal was required despite the fact that the hypnosis itself closely followed procedure and was not at all suggestive. Id. at 828-29. Similarly, in 1975, a federal district court in Georgia considered evidence relating to hypnosis and found it to be relevant to credibility and therefore covered by Giglio and Brady. See Emmett v. Ricketts, 397 F.Supp. 1025, 1039-40 (N.D.Ga.1975). In that case, as in the instant one, there was almost no evidence other than the one witness' testimony that tended to suggest that the defendants were guilty, and the government failed to turn over the records of the hypnosis of that witness. Id. The district court found that "[h]er credibility was the pivotal issue in these cases and the Hall [hypnotist] materials were absolutely essential to a fair appraisal of the credibility of the state's critical witness." Id. at 1040-41. Shingleton and Collins attempt to distinguish Emmett by arguing that the evidence in that case was relevant because the witness had stated, during hypnosis, that someone other than the defendant was responsible for the crime. This is not an accurate assessment of Emmett. In fact, the evidence was relevant because it showed a witness whose story changed greatly over time, and who was particularly influenced by hypnosis; this alone made the court seem very certain that the defense was entitled to the tapes and documents relating to the hypnosis. The court described the evidence as relevant to credibility, not as exculpatory, but still found that it should have been disclosed under Giglio. Id.
 
 
 28
 Shingleton and Collins next argue that not until the Supreme Court's decision in United States v. Bagley, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985), was the right of access to impeachment evidence clearly established. This is simply not correct. In fact the Bagley court cited Giglio for its rule that impeachment evidence as well as exculpatory evidence is covered by Brady. Id. at 676, 105 S.Ct. at 3380. Bagley did not create the duty to disclose evidence, but instead merely refined the contours of the rule. The Bagley Court clarified the materiality requirement for reversal for a Giglio violation, and created the rule that "[t]he evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Id. at 682, 105 S.Ct. at 3383. Prior to Bagley, it seems that, if anything, the test for materiality was less stringent and more infractions were found to mandate reversal of a guilty verdict. It cannot be said that, absent Bagley, appellees had no reason to know that evidence regarding identification procedures and hypnosis that cast doubt upon the defendant's guilt should be disclosed to the defense. It is noteworthy that our decision in Jean v. Rice, which resulted in Jean's release from prison, cited Giglio, and not Bagley, for the proposition that the evidence in question should have been disclosed. 945 F.2d at 87 n. 9.
 
 
 29
 Evidence exculpating the defendant, evidence establishing a motive to lie, and evidence of prior inconsistencies in witness statements were all subject to Brady and Giglio 's disclosure requirements in 1982. As we ruled in Jean v. Rice, the evidence in Jean's case should, without a doubt, have been turned over to the defense. The documents and tapes reflected numerous inconsistencies in identifications, both over time and between witnesses. The evidence further revealed the victim's inability to select defendant's photo from a lineup until she underwent a very suggestive hypnosis, and showed that the victim had in fact been shown a photo of Jean prior to identifying him in a live lineup when no other members of the lineup had been seen previously. These facts are all obviously relevant to whether Wilson's and Shingleton's identifications of Jean should have been relied upon by the jury. Likewise, even though the suggestive nature of the hypnosis of Wilson may not have rendered it inadmissible under North Carolina law regarding hypnosis at the time, it still might have inspired doubt in the minds of the jury about the validity of her post-hypnosis recollections. We conclude that, in 1982, appellees were under a clearly defined constitutional duty to disclose evidence relating to the hypnosis to Jean's counsel. Summary judgment of this case on qualified immunity grounds was therefore inappropriate.
 
 C
 
 30
 The third factor in determining whether Jean has shown that Collins and Shingleton are not entitled to qualified immunity is whether a reasonable person in the position of the defendant would have known that his behavior would violate the right at issue. Pritchett v. Alford, 973 F.2d at 312. One specific consideration relevant to this prong in the instant case is whether the officers in fact informed the district attorney about the existence of the evidence. The district attorney denies having had any knowledge of the existence of documentation of the hypnoses until after trial, but Shingleton and Collins state that they informed the prosecutors about the procedures. If the officers did pass on all relevant evidence to the district attorney, then they perhaps fulfilled their duty, and the burden fell to the district attorney to disclose the evidence to Jean's attorney. Questions, such as this one, involved in the third prong of qualified immunity present mixed issues of law and fact and may require trial by a jury or by the district court. We therefore remand so that the district court may address these issues.
 
 IV
 
 31
 Shingleton and Collins raise two additional arguments in their brief challenging both Jean's initial complaint and his appeal. Neither of these arguments is persuasive.
 
 
 32
 The appellees first argue that, as a matter of law, Shingleton is entitled to absolute immunity as a witness and should not be subjected to suit. This argument is without merit. Jean is not suing Shingleton for his testimony and behavior on the stand, but rather for his behavior during the investigation and trial preparation for Jean's trial; therefore, witness immunity does not protect him. The case upon which Shingleton relies for the assertion that even police officers are entitled to immunity from suit when they are witnesses, Briscoe v. LaHue, 460 U.S. 325, 103 S.Ct. 1108, 75 L.Ed.2d 96 (1983), involves suit for the officer's perjury on the stand. The Briscoe Court mentioned in passing that police officers receive only qualified immunity for performance of their duties other than testifying in court. Id. at 342, 103 S.Ct. at 1119. Despite Shingleton's mischaracterization of Briscoe, that case simply does not suggest that witness immunity protects witnesses from suit for actions other than their courtroom testimony. We are persuaded by the cogent reasoning of one district court which has addressed this issue. Walker v. Tyler Cty. Comm'n, 886 F.Supp. 540, 549 (N.D.W.Va.1995). In Walker the district court found that a medical examiner was entitled to absolute immunity from civil liability for allegations that he had lied on the stand. Id. However, the court also found that the defendant was entitled to neither prosecutorial nor qualified immunity for withholding exculpatory evidence. Id. at 546-47. Shingleton is similarly not entitled to immunity from suit for his role in this investigation simply because he was later a witness.
 
 
 33
 Shingleton and Collins finally argue that Jean's claims are time barred, relying upon Brooks v. City of Winston-Salem, N.C., 85 F.3d 178, 182-83 (4th Cir.1996), to support this assertion. Brooks states that claims relating to lack of probable cause for a warrantless arrest begin to accrue at the time of the arrest rather than when the eventual conviction is overturned or dismissed. Id. at 183. However, Brooks specifies that this analysis applies only when the alleged § 1983 violation does not implicate the validity of the conviction or sentence. Id. at 182-83. The Supreme Court in Heck v. Humphrey stated that when the damages are for "unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid," the plaintiff must show that the conviction has been reversed, vacated or otherwise called into question by a court. 512 U.S. 477, 486, 114 S.Ct. 2364, 2372, 129 L.Ed.2d 383 (1994). The cause of action in such cases, therefore, cannot accrue until after the reversal of the underlying conviction. Jean's claim of damage from Brady and Giglio violations did not arise until his criminal case was dismissed, and it is not time-barred.
 
 V
 
 34
 For the foregoing reasons, we reverse the court's grant of summary judgment in favor of Shingleton and Collins, and remand for further proceedings consistent with this opinion.
 
 
 35
 REVERSED AND REMANDED.
 
 
 36
 HAMILTON, Circuit Judge, concurring in the judgment:
 
 
 37
 The issue presented in this appeal is straightforward: whether, at the time of their conduct, the actions of Shingleton and Collins violated "clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). At the time of their actions, Brady and its progeny made clear that a defendant's due process rights were violated when the prosecution failed to disclose material exculpatory or impeachment evidence to the defense, regardless of whether the prosecutor acted in bad faith or even knew of the evidence. See Giglio v. United States, 405 U.S. 150, 153-54, 92 S.Ct. 763, 765-66, 31 L.Ed.2d 104 (1972). Although the Supreme Court has not explicitly addressed the disclosure duties of police under Brady, our case law at the time of Shingleton and Collins' actions clearly established that a defendant's due process rights were violated when the police concealed material exculpatory or impeachment evidence. Barbee v. Warden, 331 F.2d 842, 846 (4th Cir.1964); see also Boone v. Paderick, 541 F.2d 447, 450-51 (4th Cir.1976) (duty to disclose not "neutralized because [evidence] was in the hands of the police rather than the prosecutor"), cert. denied, 430 U.S. 959, 97 S.Ct. 1610, 51 L.Ed.2d 811 (1977).[1] As the Barbee court explained:Nor is the effect of the nondisclosure neutralized because the prosecuting attorney was not shown to have had knowledge of the exculpatory evidence. Failure of the police to reveal such material evidence in their possession is equally harmful to a defendant whether the information is purposefully, or negligently, withheld. And it makes no difference if the withholding is by officials other than the prosecutor. The police are also part of the prosecution, and the taint on the trial is no less if they, rather than the State's Attorney, were guilty of the nondisclosure. If the police allow the State's Attorney to produce evidence pointing to guilt without ever informing him of other evidence in their possession which contradicts this inference, state officers are practicing deception not only on the State's Attorney but on the court and the defendant....
 
 
 38
 The duty to disclose is that of the state, which ordinarily acts through the prosecuting attorney; but if he too is the victim of police suppression of the material information, the state's failure is not on that account excused.
 
 
 39
 331 F.2d at 846 (footnote omitted).
 
 
 40
 Accordingly, this case boils down to whether a reasonable officer in Shingleton and Collins' position would have known, when he/they acted, that the exculpatory and impeachment evidence allegedly with held from the prosecutor was material. At the time of Shingleton and Collins' actions, the materiality standard set forth in United States v. Agurs, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), governed. The Court in Agurs distinguished between three situations in which a Brady claim might arise: (1) where the prosecutor introduced testimony that he knew or should have known was false; (2) where the government failed to disclose a specific kind of exculpatory or impeachment evidence requested by the defendant; and (3) where the government failed to disclose exculpatory or impeachment evidence never requested, or requested in a general way. Under the false testimony standard, the Court noted that it had consistently set aside convictions obtained by the knowing use of false testimony when there was "any reasonable likelihood that the false testimony could have affected the judgment of the jury." Id. at 103, 96 S.Ct. at 2397 (footnote omitted). Under the specific request scenario, the Court noted that when the government failed to disclose a specific kind of exculpatory or impeachment evidence requested by the defendant, that failure, was "seldom, if ever, excusable." Id. at 106, 96 S.Ct. at 2399. The Court went on to hold that under the no/general request scenario, the government failed in its duty to disclose when suppression of the evidence would be "of sufficient significance to result in the denial of the defendant's right to a fair trial." Id. at 108, 96 S.Ct. at 2400. In other words, if the undisclosed evidence created "a reasonable doubt that did not otherwise exist," there was constitutional error. Id. at 112, 96 S.Ct. at 2402.[2]
 
 
 41
 In my opinion, at the time of Shingleton and Collins' actions, a reasonable officer would have known that the evidence allegedly withheld would have created "a reasonable doubt that did not otherwise exist." Id. To appreciate and understand the significance of the audio recordings and the accompanying reports of the hypnosis of Wilson and Shingleton, it is crucial to recognize that the state's case hinged on the identification of Jean by Wilson and Shingleton. As we recognized in our earlier opinion:
 
 
 42
 [T]here was little independent corroborating evidence to sustain Jean's conviction: there were no fingerprints or matching pubic hairs; the blood/semen test only placed Jean in the same 32% as the rapist; and the voice exemplar was of dubious quality, had only one black voice on it, and presented difficulty to Ms. Wilson, causing her to take one week to make her identification.
 
 
 43
 Jean v. Rice, 945 F.2d 82, 87 (4th Cir.1991). Because there was little independent evidence of guilt outside the inconclusive identification evidence, a reasonable officer would have known that the audio recordings and accompanying reports of the hypnosis of Wilson and Shingleton would have created "a reasonable doubt that did not otherwise exist." Agurs, 427 U.S. at 112, 96 S.Ct. at 2402. Indeed, it cannot be denied that the audio recordings and the accompanying reports of the hypnosis of Wilson and Shingleton contained numerous inconsistencies with previous descriptions of the assailant and that the hypnotic techniques were suggestive. For example, as to Shingleton, under hypnosis, the stripe on the t-shirt became a sweatmark, and the mustache disappeared. In addition, Shingleton recalled white shoelaces and striped socks under hypnosis, but Jean's shoelaces were black and his socks had no stripes. Finally, he recalled glassy eyes under hypnosis despite his earlier statement that he could not see the suspect's eyes. Along a similar vein, Wilson's inability to identify Jean as the assailant until after she underwent a very suggestive hypnosis made the audio recordings and the accompanying reports of the hypnosis all the more critical. All of this evidence not only was critical to impeach the testimony of Wilson and Shingleton, but it strongly suggested that someone else committed the crime. In short, the audio recordings and the accompanying reports of the hypnosis went directly to the heart of the state's case--whether Jean, as opposed to someone else, committed the crime--and should have been disclosed.
 
 
 
 [1]
 The hypnosis itself was very suggestive, and during the procedure the officers effectively persuaded Wilson that Jean could have been her assailant. However the validity of the procedure itself is not at issue today, but only the exculpatory nature of evidence regarding the procedure
 
 
 [2]
 These two identification procedures were also highly suggestive and unreliable in several respects, but are not in and of themselves at issue in this case
 
 
 [1]
 We have recognized that a police officer's failure to disclose exculpatory evidence that should have been disclosed under Brady is cognizable under § 1983. See Carter v. Burch, 34 F.3d 257, 263-64 (4th Cir.1994) (affirming jury verdict against police officer for withholding exculpatory evidence that should have been disclosed under Brady ), cert. denied, 513 U.S. 1150, 115 S.Ct. 1101, 130 L.Ed.2d 1068 (1995)
 
 
 [2]
 The materiality standard was modified in subsequent Supreme Court cases. In United States v. Bagley, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985), the Court disavowed any difference between exculpatory and impeachment evidence and abandoned the distinction between the second and third Agurs scenarios. In Bagley, the Court held that evidence was material if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Id. at 682, 105 S.Ct. at 3383 (opinion of Blackmun, J.); id. at 685, 105 S.Ct. at 3385 (White, J., concurring in part and concurring in judgment). "A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome[of the trial.]" Id. at 682, 105 S.Ct. at 3383. Following Bagley, the Court has consistently adhered to the Bagley standard. See, e.g., Kyles v. Whitley, 514 U.S. 419, ----, 115 S.Ct. 1555, 1566, 131 L.Ed.2d 490 (1995) ("A 'reasonable probability' of a different result is accordingly shown when the Government's evidentiary suppression 'undermines confidence in the outcome of the trial.' " (quoting Bagley, 473 U.S. at 678, 105 S.Ct. at 3381))