**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

REGINALD JEROME LOVE,
Petitioner-Appellant,

v.

No. 96-6361

FRANKLIN FREEMAN, Secretary of
Corrections; MICHAEL EASLEY,
Attorney General,
Respondents-Appellees.

Appeal from the United States District Court
for the Eastern District of North Carolina, at Raleigh.
Malcolm J. Howard, District Judge.
(CA-92-189-5-H)

Argued: June 10, 1999

Decided: August 30, 1999

Before MURNAGHAN, WILKINS, and HAMILTON,
Circuit Judges.

_____

Reversed and remanded with instructions by unpublished per curiam
opinion.

_____

**COUNSEL**

**ARGUED:** James Phillip Griffin, Jr., NORTH CAROLINA PRIS-
ONER LEGAL SERVICES, INC., Raleigh, North Carolina, for
Appellant. Clarence Joe DelForge, III, Assistant Attorney General,
NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North

Carolina, for Appellees. **ON BRIEF:** Linda B. Weisel, Marcus Jimison, NORTH CAROLINA PRISONER LEGAL SERVICES, INC., Raleigh, North Carolina, for Appellant. Michael F. Easley, Attorney General, NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for Appellees.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

Appellant Reginald Jerome Love appeals the district court's rejection of his petition for a writ of habeas corpus under 28 U.S.C.A. § 2254 (West 1994), challenging his conviction for various sexual offenses under Brady v. Maryland, 373 U.S. 83 (1963). Despite undisclosed evidence indicating that the victim had a known problem for lying and living in a "fantasy world," and various evidence of a potentially exculpatory and impeaching nature, the district court held that Love had not satisfied the Brady standard of materiality. We reverse the district court.

I.

The facts of this case are set forth in some detail in a prior opinion associated with Love's Brady claim. See Love v. Johnson, 57 F.3d 1305, 1307-12 (4th Cir. 1995). We repeat those facts only as relevant to the case at bar.

Love was convicted following a jury trial of first-degree rape, first-degree sexual offense, and taking indecent liberties with a minor. He was sentenced to two concurrent life terms plus five years. On appeal, the North Carolina Court of Appeals affirmed, State v. Love, 395 S.E.2d 429 (N.C. Ct. App. 1990), and the North Carolina Supreme

2

Court denied discretionary review. <u>State v. Love</u>, 402 S.E.2d 423 (N.C. 1991).

The state's case rested chiefly on the evidence described below.**1** The alleged victim, then a ten year-old minor, testified that Love, when he was her mother's live-in boyfriend, had sexually abused her one night.**2** The minor described the alleged incident in some detail. The minor testified to the fact that sometime soon after the alleged abuse occurred, the minor wrote a note to her mother indicating in explicit detail what had occurred.

Kimberly Crews, the Social Worker who first interviewed the minor, testified to the story that the minor had told her at that interview and certain other matters. Ms. Crews testified that the minor had initially denied that anything had happened but later described the details of the alleged incident. Detective C. M. Murray testified, <u>inter alia</u>, as to the contents of a separate statement the minor had given describing the alleged incident. The minor's mother testified to what the minor had told her. The minor's mother admitted that she at first did not believe the minor, but claimed that she later changed her mind because of the way that Love acted after the minor made the allegations.

Dr. Denise Everette, the physician who performed the physical examination of the minor, testified that the examination revealed two physical indications that the minor had in fact been sexually abused. First, Dr. Everette testified that the minor's hymenal opening was unusually large for a girl of her age.**3**  Second, Dr. Everette reported

---

**1** In addition, testimony was received from the minor's grandmother, who was in the apartment with the minor and Love at the time of the alleged incident but unaware that it had occurred; Dr. Robert Kratz, who had seen the minor for an injury to, <u>inter alia</u>, her vaginal area a few months prior to the alleged incident; and Love himself.
**2** The couple, along with the minor, two other children, and the minor's grandmother shared a small apartment in Raleigh, North Carolina at the time of the alleged abuse.
**3** A close reading of the direct and cross of Dr. Everette shows that she did not in fact rely upon the size of the hymenal opening to come to any

that the minor had what appeared to be hymenal lacerations, consistent with penile penetration.

The defense theory at trial was that Love was an innocent man falsely accused by a minor who was emotionally disturbed. The previous panel well summarized the defense's efforts:

> Love's defense consisted of his own testimonial denial of the charged incident, and cross-examination of the state's witnesses designed to impeach the minor's general and specific credibility and to emphasize the physical implausibility of her account of the charged incidents having occurred undetected just down the hall from her grandmother's open-door room. Defense counsel was able to elicit from the minor concessions of her animosity, "hate," toward Love that predated the charged incident; of her advanced sexual awareness; and of her treatment by prescription drug for hyperactivity. This supplemented earlier testimony elicited by the prosecutor on direct examination in which the minor had conceded attention-seeking episodes of bizarre behavior on her part -- shaving her eyebrows, setting fires in her residence -- that were followed by psychiatric counseling. No records concerning her conceded counseling at Wake Mental Health Center or her custody by the Department of Social Services (the subject of two of the quashed subpoenas[, see infra]) were introduced. Testifying in his own behalf, Love denied any sexual encounter with the minor at any time. He claimed her account was simply false and attributed it to her animosity and resentment of his relationship with her mother.

Love, 57 F.3d at 1311.

_____

conclusions about whether the minor had been sexually abused (i.e., that this evidence was irrelevant to that conclusion). It is unclear, then, why this evidence, which could only have confused the jury without some explanation of its medical significance, was admitted over Love's objection.

4

Prior to the trial, defense counsel had subpoenaed various medical, mental health, and social service records on the victim from the state. In discovery, the state district attorney's office voluntarily produced the report of Dr. Everette's physical examination, a summary report of counselor Crews' interview, and the police report of the alleged incident. Love was not satisfied with these disclosures and, invoking Brady, continued to demand additional materials in the state's possession from the minor's medical health, mental health, and social services records.

The ensuing proceedings with regard to Love's various subpoenas and Brady motions are tortured, indeed. This series of events has been explained in depth elsewhere. See Love, 57 F.3d at 1307-1311. Suffice it to say that several hearings were had in front of two different judges and the end result was that the court did not grant an in camera review of the requested documents. Love was therefore forced to proceed to trial without them. The prior panel to hear Love's claim intimated that the prosecutor's incorrect representations and confused presentation at a hearing before a judge who was assigned the case after it was underway may have contributed to the denial of the in camera review. See Love, 57 F.3d at 1309, 1310, 1314.

The jury found Love guilty and sentenced him accordingly. After his appeals in the state courts were exhausted, Love filed a petition for a writ of habeas corpus under 28 U.S.C.A. § 2254 with the United States District for the Eastern District of North Carolina claiming that his rights under Brady and Pennsylvania v. Ritchie, 480 U.S. 39, 56 (1987), had been violated. The district court dismissed that motion. This Court reversed. We determined that Love made a plausible showing that the sought after records might contain evidence favorable to the defense; the state court's refusal to inspect the identified records in camera therefore violated Love's constitutional rights. See Love, 57 F.3d at 1313-16. Accordingly, this Court remanded the case with instructions that the district court conduct an in camera inspection of the materials to determine whether with reasonable probability they would have changed the outcome of Love's trial. See id. at 1315-16.

Following its in camera review, the district court stated that it could not determine whether the information contained in the records

5

would have changed the outcome of Love's trial. Consequently, the court entered an order allowing counsel for both parties to view all of the documents and materials received by the court, after which the court would conduct a hearing to determine whether the evidence was material. Following the hearing, the district court found that none of the information contained in the suppressed records was material under the Brady standard and denied Love§ 2254 relief. Love noted a timely appeal to this Court.

## II.

Questions of materiality under Brady v. Maryland , 373 U.S. 83, 87 (1963), are mixed questions of law and fact. E.g., Cornell v. Nix, 976 F.2d 376, 382 (8th Cir. 1992); United States v. Rivalta, 925 F.2d 596, 598 (2d Cir. 1991); Carter v. Rafferty, 826 F.2d 1299, 1306 (3d Cir. 1987); Bowen v. Maynard, 799 F.2d 593, 610 (10th Cir. 1986); Ruiz v. Cady, 635 F.2d 584, 589 (7th Cir. 1980); Davis v. Heyd, 479 F.2d 446, 451 (5th Cir. 1973). Cf. Savino v. Murray , 82 F.3d 593, 598 (4th Cir. 1996) (stating that claim of ineffective assistance of counsel, including prejudice component, is mixed question of law and fact). Therefore, we review prior determinations of materiality in Brady claims de novo.[4] See, e.g., Savino, 82 F.3d at 598;Ashe v. Styles, 67 F.3d 46, 50 (4th Cir. 1995); Cornell, 976 F.2d at 382.

The state's affirmative obligation as a matter of due process to dis- close evidence favorable to a criminal defendant is well-established. See Kyles v. Whitley, 514 U.S. 419 (1995); Pennsylvania v. Ritchie, 480 U.S. 39; United States v. Bagley, 473 U.S. 667 (1985); Brady v. Maryland, 373 U.S. 83. Brady material includes both evidence that tends to exculpate the accused and evidence that may be used to impeach prosecution witnesses. See United States v. Bagley, 473 U.S. at 682-83. See also United States v. Trevino, 89 F.3d 187, 189 (4th Cir. 1996); Jean v. Rice, 945 F.2d 82, 87 (4th Cir. 1991); Chavis v. State of North Carolina, 637 F.2d 213, 224 (4th Cir. 1980); Norris v.

_____

**4** This federal habeas petition was filed prior to the effective date of the Antiterrorism and Effective Death Penalty Act ("AEDPA") of April 24, 1996, thus the AEDPA amendments to § 2254(d), see 28 U.S.C.A. § 2254(d) (West Supp. 1999), do not apply. Lindh v. Murphy, 521 U.S. 320, 322 (1997).

Slayton, 540 F.2d 1241, 1244 (4th Cir. 1976)."When the reliability of a given witness may well be determinative of guilt or innocence, nondisclosure of evidence affecting credibility falls within" Brady. Giglio v. United States, 405 U.S. 150, 154 (1972) (internal quotations omitted).

A reviewing court examines Brady evidence to determine whether it is "material," i.e., whether there is a"reasonable probability" that had the evidence been disclosed the result of the proceeding would have been different. See Kyles, 514 U.S. at 434. The reasonable probability test "is not a sufficiency of evidence test. A defendant need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict." Id. at 434-35. A "reasonable probability" of a different result is shown if the suppression of the evidence undermines confidence in the trial's outcome. See id. at 434; Bagley, 473 U.S. at 678. It is less than a preponderance: "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." Kyles, 514 U.S. at 434. If the defendant fulfills the reasonable probability analysis, the error cannot be harmless. See id . In performing this reasonable probability analysis, a court should examine the undisclosed evidence item by item, but then must also consider the cumulative effect of all the suppressed evidence, see Kyles , 514 U.S. at 436-37; United States v. Ellis, 121 F.3d 908, 916 (4th Cir. 1997), cert. denied, ___ U.S. ___, 118 S. Ct. 738 (1998), including the effect on the defendant's preparation or trial presentation, see Bagley, 473 U.S. at 683.

III.

Love first asserts that the district court erred when it improperly construed the law on "reasonable probability" against him during its in camera review of the suppressed evidence. Love suggests that because the district court allowed the parties to review the documents in camera and then conducted a closed hearing, the court was in "virtual equipoise" as to whether the suppressed records would probably have changed the outcome of his trial. Therefore, the district court was obliged to grant Love habeas relief. See O'Neal v. McAninch, 513

7

U.S. 432, 434, 437 (1995) (holding that when the matter is so balanced that the judge feels himself in "virtual equipoise" about the effect of the error on the verdict, the judge must resolve that doubt in favor of the habeas petitioner).

Love's argument fails. First, O'Neal dealt with a different and more relaxed standard of relief. See id.;Kyles, 514 U.S. at 436.[5] Second, the record reveals that the district court judge did not hold a hearing because he was in "virtual equipoise," but rather because the original criminal trial was not conducted in front of him. Thus, to assist the court in managing the voluminous amount of information in the case, the district court judge simply utilized the attorneys to marshal all of the pertinent information in order to make a satisfactory determination regarding the impact of these materials on Love's criminal trial. Consequently, we reject this claim.

IV.

Love argues that the following evidence, taken alone or cumulatively, is sufficient to provide a reasonable probability of a different outcome.[6] We agree. Our decision is based in particular on the undisclosed evidence about the minor's self-destructive jealousy at times

_____

[5] It is worth noting that because materiality requires less than a preponderance, see Kyles, 514 U.S. at 434, the same rule would appear to hold in the Brady context.

[6] In addition to the evidence detailed below, Love also asserts that the following suppressed evidence was material: evidence that the victim was told about "good touch and bad touch;" that the victim tried using tampons; that the victim was subjected to corporal punishment; that the victim was having problems with her father contemporaneous with the allegations; and that a social worker described the minor's mother's apartment as "too close in there." The claims regarding these pieces of evidence are meritless. The record shows that at trial, Love's counsel asked the minor about "good touch and bad touch." (J.A. at 252.) Regardless of whether the minor had used tampons, one of the prosecution doctors testified that the use of tampons could not cause the physical evidence she observed. Love has offered no explanation how the minor's exposure to corporal punishment, her contemporaneous problems with her father, or the social worker's statement could be used to exculpate him or to impeach other witnesses.

8

directed towards Love, the minor's history of lying and living in a fantasy world, the possibility that the minor was first interviewed using an inappropriately suggestive technique, and the possible previous rape of the minor.

A. Failure to Disclose Minor's Various Statements

Love contends that various undisclosed evidence that the minor denied that she had been abused and that the minor gave inconsistent stories was material.

1. Minor's Denials that Anything had Happened

The withheld evidence shows that the minor twice denied that she had been sexually abused (once more than the jury was made aware). The withheld evidence shows that the minor told her school counselor, McRee, that she had not been sexually abused. Some time later, the minor did tell McRee that she had been raped.

In and of itself, this evidence would not be material. The jury heard evidence that the minor initially denied the abuse to Kimberly Crews, the social worker who first interviewed her about the alleged incident. The minor subsequently described the rape to Crews in some detail. Thus, the jury was not unaware that the minor had denied the abuse. Further, Crews testified that sexually abused children do not always report the abuse right away. Therefore, it is difficult to believe that knowledge of one additional denial before the child had ever reported the crime to authorities would have been material to the jury.[7]

2. Inconsistencies in Minor's Statements

Love also points out that the suppressed evidence contained various accounts of the rape by the minor and asserts that the inconsistencies in these accounts were material.

_____

[7] When coupled with evidence that the victim was a known liar, and with evidence that Crews used a suggestive interviewing technique with the victim, this additional denial could take on greater importance.

9

a. Description of Clothing

In one account, the minor alleged that Love pulled her gown up and pulled down her panties. (J.B. at 65.)[8] In another, the minor stated that Love told her to pull up her nightgown. (J.B. at 79.) In another account, the minor did not mention a nightgown and alleged that Love "pulled her pants down." (J.B. at 101 (emphasis added).)

b. Description of Activities After the Alleged Incident

In one account, the minor alleged that after Love left, she locked the door, washed off, changed clothes, and went to her grandmother's room. (J.B. at 66.) In another account, she stated she just stayed in her room. (J.B. at 102.) At trial, she testified that she closed her door and locked it after Love left. (J.A. at 224.)

c. Whether Love had been Drinking

In her interview with Crews, the minor said that she did not know if Love had been drinking that night. (J.B. at 67.) In another account and at trial, the minor stated that Love had been drinking and that she could smell alcohol on his breath. (J.B. at 101; J.A. at 222.)

d. Whether Love Said Anything

In one account the minor said that Love did not say anything the whole time and that he did not ask her to do anything. (J.B. at 101; J.A. at 220.) In another account, the minor stated that Love told her to pull up her nightgown. (J.B. at 79.) At trial and in another account, the minor stated (or indicated) that Love told her to "put [her] mouth on his thing." (J.A. at 220.)

_____

[8] There are two volumes of the record. Volume A was the record before the court in Love v. Johnson, 57 F.3d 1305. Volume B is generally the previously undisclosed material. For ease of reference, Volume A is cited as "J.A. at" and Volume B is cited as "J.B. at."

10

e. <u>Love's Post-Attack Statements</u>

In the first account given by the minor, the most complete questioning of the minor evident in the record, the minor stated that after the rape, Love told her not to tell anyone or he would go to prison. (J.B. at 67.) The minor did not allege that Love threatened to kill her or her family. She ended this interview by saying,"I've told you everything." (J.B. at 68.) In another account and at trial, however, the minor alleged that Love told her not to tell because he would go to prison <u>and</u> that Love threatened to kill her and her family. (J.B. at 101; J.A. at 223.)

f. <u>Whether the Incident Involved Sodomy</u>

In one account and at trial, the minor asserted that Love had her put "his thing" in her mouth. (J.B. at 67; J.A. at 220-221.) In another account, the minor did not mention any sodomy. (J.A. at 101.) Further, in one account, the minor asserted that Love"tried to put his face down there but I pushed him away." (J.B. at 101.) The minor never included this detail in any other account. (<u>See</u> J.B. at 62-69; J.A. at 201-226.) Also, in one account, and at trial, the minor asserted that Love put his finger in her. (J.B. at 67; J.A. at 223.) In another account the minor did not make this assertion. (J.B. at 101.)

g. <u>Conclusion</u>

These inconsistencies are clearly relevant. Skillful defense counsel would have been able to use them as one piece of evidence that the minor had manufactured the story. If the inconsistencies were the only pieces of undisclosed evidence, it would be a close question whether they were so material as to cast doubt on the outcome of the trial. As the state points out, the victim's basic account of the attack remained the same throughout and given the child's age, a jury could expect some inconsistencies. Further, the jury could well conclude that some of the inconsistencies, i.e., what Love said after the attack, and what the minor did after the attack, were not inconsistencies at all, but merely omissions of collateral details or consistent descriptions based on varying time frames.

11

We think, however, that when viewed in combination with some of the other suppressed evidence -- i.e., coupled with the evidence that Crews had coaxed the minor into her story through improperly suggestive interview techniques and that the child had a problem with lying -- the evidence of these inconsistencies takes on greater weight. These inconsistencies would certainly have bolstered a theory that counselor Crews' suggestive interview technique helped the child formulate her allegations. Several of the details upon which the child was inconsistent were elicited by leading questions from Crews. For instance, the first mention of whether Love had been drinking the night of the alleged incident came in two leading questions posed by Crews to the minor. (See J.B. at 67.) Similarly, the first mention of sodomy came from a leading question by Crews. (See J.B. at 67.)

B. Failure to Disclose Evidence of Minor's Emotional Problems
        and Problems with Lying

The state's case depended centrally upon two lines of evidence -- most primarily the credibility of the minor, and secondarily the medical testimony corroborating that she may have been sexually abused. The improperly withheld evidence contained damaging impeachment evidence against the minor.

The state asserts, however, that this evidence is not material because Love could not have obtained admission of most of this evidence, in particular evidence about the minor's emotional problems. Much of this evidence would be subject to a qualified social worker privilege, N.C. Gen. Stat. § 8-53.7 (1998), school counselor privilege, N.C. Gen. Stat. § 8-53.4 (1998), or psychologist privilege, N.C. Gen. Stat. § 8-53.3, 8-53.8 (1998), in North Carolina. We disagree with the state. First, the evidence about the minor's perhaps pathological lying history would clearly be admissible. Second, we think that because the state opened the door to the minor's emotional problems by having the minor testify about some of her emotional problems at trial, and because of its high level of relevance to the defense theory, a judge would have allowed at least the most relevant evidence in. Cf. Chavis, 637 F.2d at 224 (evidence of psychiatric report of key witness relevant to witness' credibility).

12

1. <u>Lying and Fantasy World</u>

The suppressed records contain the following evidence that the minor had a problem with lying and distinguishing fantasy from reality: Just one month after the minor made the allegations, the minor's foster mother reported that the minor "lies with a straight face and looking you in the eye" and said that she lives in a "fantasy world." (J.B. at 21.) Just one month after the minor made her allegations, her social worker was working with the minor about "being honest" and questioned whether they could do psychological testing about her "fantasy vs. reality" problems. (J.B. at 23.) The records also contain numerous notations from various therapists and Department of Social Services personnel about the minor's lying or exaggeration: "Some of her comments were exaggerated," (J.B. at 43),"fantasy life, problem with honesty," (J.B. at 118), "Can be very`sneaky' and will lie at every opportunity," (J.B. at 122), "exhibits a great deal of lying," (J.B. at 124), "lying," (J.B. at 119), "lies and tells elaborate stories." (J.B. at 94.)

This information is obviously highly relevant given the central role the minor's credibility played. When guilt or innocence may well depend upon the reliability of a given witness, non-disclosure of evidence affecting that witness's reliability is very likely to be material. <u>See Giglio</u>, 405 U.S. at 153-54; <u>Ellis</u>, 121 F.3d at 917. We hold that this evidence, standing alone, was material, and entitles Love to the requested relief.

2. <u>Self-Destructive and Attention-Seeking Behavior</u>

Love believes the evidence of the minor's troubling behavior would have been admissible to impeach her credibility and to establish that she had a motive to lie.

Love cites to the following evidence. There were undisclosed problems with depression, sleeplessness, suicide threats, and one suicide attempt. The suppressed evidence also showed that the minor had engaged in behavior such as head banging that caused holes in the wall, scraping the soles of her feet with a razor, and wrapping a clothesline around her neck. Further, the suppressed evidence showed

13

that the minor set fire to her new brother's bed **9** (the son that Love had fathered) shortly before her accusation against Love because she felt neglected and resented the new baby. The records contain several notes regarding the minor's history of problems with jealousy for her mother's attention. (J.B. at 16, 27, 34, 37, 38, 45, 81.) The evidence also indicates that the minor hated Love. Finally, there is a statement from the minor's social worker that she was "concerned about [the minor's] behavior after the new baby is born in February as she will have even less attention at that time and the home will be even more crowded and the stresses will be greater." (J.B. at 116.) Love points out that the time period over which the social worker was concerned is precisely the time period when the minor made her accusation against him.

We do not think that all of this evidence is material. The minor's generalized emotional problems are not particularly relevant to her credibility. Also, the fact that the minor hated Love was elicited at trial directly from the minor. However, some of the other evidence was highly relevant to Love's defense, in particular, the evidence indicating that the minor would engage in abnormal behavior in an effort to get attention, and that the minor felt that Love and his new baby were stealing attention away from her. Again, if this evidence was in isolation, it might not be material. In combination with all of the other undisclosed evidence, however, we hold that Love is entitled to relief.

3. Conclusion for the Above

The state argues that the above evidence would have been only cumulative, so was not material. See Ellis, 121 F.3d at 916-17. The state points out that the jury heard evidence that the minor lied in the past (from both the victim herself and her mother), that she shaved her eyebrows, that she once started fires in her room, that she was taking Ritalin for hyperactivity, that she placed knives under her bed, that she had viewed a few minutes of one of her mother's adult films, and that she hated Love because he cut her mother with a knife.

_____

**9** The baby was still in the hospital; he was not in the bed at the time of this incident.

14

The state is correct that this evidence put the jury on notice that the minor occasionally lied and suffered some behavioral problems. We believe, however, that the hidden evidence was of a quantity and quality which could have significantly altered the jury's perception of the minor. There is a marked difference between evidence that a minor has lied occasionally in the past (a fairly typical and benign scenario), and evidence that social workers, school counselors, and foster parents believe the child can and does lie through her teeth and lives in a fantasy world (an unusual and much more sinister scenario). There is also a marked difference between evidence that a minor has occasionally done unusual things because she craved attention, and evidence that the minor has repeatedly engaged in destructive and self-destructive behavior because of jealousy about her mother's or father's attention. This is especially so when such evidence is compounded by a social worker's stated fear that the child's socially dysfunctional behavior would increase in severity just at the time that the minor made the allegations of rape. Therefore, we hold that this evidence is material.

C. <u>Failure to Provide Tape Recording & Transcript of Crews</u>
       <u>Interview</u>

Love claims that the state's failure to turn over the tape recording and transcript of Crews' interview with the minor prevented him from effectively impeaching Crews and developing the theory that Crews' improper interviewing techniques tainted the minor's testimony.[10]

We agree that the undisclosed transcript could have been effectively used by the defense to argue that Crews used an improperly suggestive interview technique. According to child abuse literature cited by Love, "great care must be taken to avoid leading questions and coercive techniques; the child must be allowed to tell his story in his own words." American Academy of Child & Adolescent Psychiatry, Guidelines for the Clinical Evaluation of Child and Adolescent Sexual Abuse (Dec. 1990), <u>reprinted in</u> J.B. at 159-60. Love asserts

_____

[10] Love also notes other potential avenues of impeachment evident from the transcript of the interview. Most importantly, Crews failed to appreciate the importance of the fact that the minor knew that her mother had been abused as a child.

15

that the problems in Crews' questioning of the minor are analogous to the dangers inherent in hypnotically enhanced testimony that this court recognized in Jean v. Rice, 945 F.2d 82 (4th Cir. 1991). In Jean, this court reaffirmed the Supreme Court's analysis of this issue in Rock v. Arkansas, 483 U.S. 44, 59-60 (1987):

> Three general characteristics of hypnosis may lead to the introduction of inaccurate memories: the subject becomes "suggestible" and may try to please the hypnotist with answers the subject thinks will be met with approval; the subject is likely to "confabulate," that is, to fill in details from the imagination in order to make an answer more coherent and complete; and the subject experiences"memory hardening," which gives him great confidence in both true and false memories, making effective cross-examination more difficult.

Jean, 945 F. 2d at 86. In the present case, Love asserts that all three characteristics are present: 1) Suggestible : Ms. Crews asks questions in a manner suggesting that she believes the minor was abused and indicates that she wants the minor to confirm this. 2) Confabulate: Crews gets the minor to expound on details by introducing the information in her leading questions. 3) Memory hardening: In subsequent statements and at trial the minor was certain of all details and assured of her testimony, even though prior to that she had given inconsistent statements.

Although the comparison to hypnotically induced testimony is only an analogy, the transcript of Crews' interview does show that Crews used leading questions at various times and supplied the minor with information in her questions which ultimately became part of the minor's story:

> After the minor denied that anyone had "messed with" her, Crews stated: when your mama called, she said that you had told her that her boyfriend had been messing with you. (J.B. at 63.)

> And what else? Did you have on, did you have on panties or underwear or anything? (J.B. at 65.)

16

Did he have clothes on or did he pull his clothes off or did he do anything to his clothes? (J.B. at 65.)

Were you wet or anything in your private parts? (J.B. at 66.)

Were your panties dirty or wet or anything? (J.B. at 66.)

What about your gown? Was it dirty or wet or anything? (J.B. at 66.)

Did he kiss you? (J.B. at 66.)

Did he lick you or suck you anywhere? (J.B. at 66.)

Did he make you do anything to his thing? (J.B. at 67.)

Did he touch you with his hands anywhere? (J.B. at 67.)

You said he put his thing inside of you, did he put anything else in there? Did he put his hands or his fingers or anything else inside there? (J.B. at 67.)

[H]ad he been drinking or using drugs . . . .? (J.B. at 67.)

The state argues that the summary of Crews interview, which Love was given, did not differ materially from the information contained in the transcript. The summary omitted certain crucial exchanges of leading questions, however. Specifically, the summary states, "I asked who had messed with her & she said `nobody.' I explained that I knew she reported to her mother that someone had `messed' w/her." (J.B. at 61 (emphasis added).) In fact, Crews had told the minor that Crews knew that the minor had told her mother that the boyfriend messed with her. (J.B. at 63.) The summary stated,"I asked [the minor] if she kissed or sucked him anywhere & she responded . . . `he made me suck his thing.'" (J.B. at 56.) In fact, Crews never asked the minor if she kissed or sucked him, rather the quoted answer was elicited by the leading question, "Did he make you do anything to his thing?" (J.B. at 67.) Finally the summary states,"I asked if he touched her anywhere & she said he touched her breasts and vagina with his

17

hand . . . . She further said he put his finger inside her private." (J.B. at 56.) In fact, Crews had asked the leading question, "did he put his hands or his fingers or anything else inside there?" (J.B. at 67.)

In Jean we recognized that use of a suggestive interview technique can itself be material. Jean, 945 F.2d at 87 (involving hypnosis). If this were the only piece of undisclosed evidence, it would be a close question whether the evidence was material. The minor had alleged that Love was the perpetrator before she interviewed with Crews, and her basic story remained the same throughout. A jury would have thought somewhat harder about whether every detail of the story is true with this evidence, but it is unclear if there is a reasonable proba-bility that disclosure would have yielded a different result. When aggregated with all of the other Brady evidence, however, we find materiality.

D. Failure to Provide Complete Records of Hymenal Exam

Love contends that the state's failure to disclose the complete med-ical records of Dr. Denise Everette's examination of the victim pre-vented him from impeaching Dr. Everette's medical testimony and from obtaining his own medical expert. Specifically, Love asserts that the state failed to disclose the colposcopic slides (magnified photo-graphs) that were taken of the victim's hymen.[11]

_____

[11] Love makes two other charges relating to Dr. Everette's exam. First, Love asserts that the state somehow withheld evidence that would have allowed him to rebut Dr. Everette's implied assertion that the size of the minor's hymenal opening was consistent with penetration. Second, Love takes issue with the fact that Dr. Everette's report stated only that there were "possible" lacerations on the hymen, while at trial she testified without equivocation that there were, in fact, such lacerations present. These arguments have no merit. Love was given a copy of Dr. Everette's report, which contained all the information necessary for Love to rebut Dr. Everette on these points at trial. See Hoke v. Netherland, 92 F.3d 1350, 1354 (4th Cir. 1996) (no Brady violation when evidence is "rea-sonably available to the defendant" through other means); United States v. Wilson, 901 F.2d 378, 381 (4th Cir. 1990) (no Brady violation when the information was available to the defendant or lies in a source where a reasonable defendant would have looked).

18

Love asserts that if he had had the colposcopic slides, he could have obtained his own expert to interpret them. Love is correct that he was denied access to this crucial opportunity to challenge Dr. Everette's testimony. This opportunity is even more important because Dr. Everette's interpretation of the slides was the only physical evidence offered by the state to corroborate the minor's allegations. Clearly, a favorable second opinion challenging Dr. Everette's examination technique and opining that there were no lacerations after all may have severely undermined the state's only corroborating physical evidence.**12** Even though Love already had evidence to challenge Dr. Everette's conclusions (namely that such lacerations were only possible, not certain), a jury would have been much more impressed by testimony from another medical professional analyzing the same data available to Dr. Everette and challenging her conclusions. There is a marked difference between cross-examining a hostile witness but being stuck with her confident answers and presenting a second opinion of another expert witness who can stand up to the state's cross. In combination with the other suppressed evidence, we find this evidence to be material.

E. <u>Failure to Provide All Previous Statements by Minor's Mother Indicating Disbelief of Minor and Indicating That She May Have Been Coerced into Believing Minor</u>

1. <u>Disbelief of Daughter</u>

The undisclosed records show that the minor's mother made several statements indicating that she did not believe her daughter and that she supported Love. Love admits that he knew that the minor's

_____

**12** The state points out that the expert referred to the existence of the slides during her cross-examination and, pursuant to N.C. Gen. Stat. § 8C-1, Rule 705 (1998), an expert may be required to disclose the underlying facts or data on cross-examination. Thus, the state argues that Love's failure to seek the slides on cross-examination constitutes a procedural bar. It is unlikely, however, that the trial court would have stopped the trial midstream in order to grant Love an expert. Plus, Love had an outstanding demand for the slides. He did not have an obligation to continually renew his request for the records piecemeal in order to preserve his <u>Brady</u> claim. <u>See Ellis</u>, 121 F.3d at 914-15.

19

mother told Crews and Dr. Everette that she did not believe her daughter, but contends that he should have been provided with the other statements she made in support of him and her reasons for refusing to believe her daughter.

The records show that the minor's mother gave many reasons for her disbelief of the minor's allegations and her support of Petitioner's denial. These include her statements that "[m]y daughter lies" (J.B. at 85); "the child has told stories in the past" (J.B. at 80); she "never saw a sign that Reggie would do anything like that to[the child]" (J.B. at 73); "I don't think my boyfriend did that to her" (J.B. at 89); "I believe him to the fullest. He has kept her overnight . . . and nothing has ever happened. He has babysat" (J.B. at 91); the child is "just being typical" (J.B. at 89); "she just wanted more attention from me" (J.B. at 89). None of these statements were provided to Love.

The state argues that Love knew that the minor's mother had told Social Services that she thought that her daughter was lying. He could have specifically asked the minor's mother why she did not believe the minor and what exactly she told Social Services staff members. Furthermore, at trial the jury heard evidence that the minor had lied in the past, that she hated Love, and that she had a motive to fabricate her story, so this evidence is only cumulative.

We think the state misses the point. Even if Love had cross examined the minor's mother on the content of her statements, he would not have been able to impeach her if she lied or otherwise altered her answers. Obviously, the presence of a prior inconsistent statement is a powerful impeaching tool. Nonetheless, the state's ultimate conclusion is correct. This information was only indirect evidence that the child had lied. Plus, the jury was made aware that the minor's mother did not initially believe her daughter and some of the reasons for that disbelief. In and of itself, this evidence is not material.

2. Why the Minor's Mother Changed Her Mind

Love's next argument is stronger. Love asserts that several undisclosed statements indicate that the mother was coerced by Social Services into supporting her daughter. After the alleged rape, Social Services took the minor away from her mother. Some undisclosed

20

statements indicate that the minor's mother thought that if she had only believed her daughter, then Social Services would not have taken her away. These are supported by the petition to remove the minor from the home. (See J.B. at 92 (stating as one reason for the removal, "the juvenile has been the victim of first degree rape . . . . The response of the mother to the juvenile's statements of the crimes has been alternately, to believe the juvenile or to declare the juvenile is lying.").) On direct examination, the minor's mother offered an alternative explanation for why she changed her mind: because Love "with his mixed feelings, made me feel like that he had done something." (J.A. at 291.)

The state argues that the record shows that Love was aware that Social Services was putting pressure upon the minor's mother to believe her daughter.[13] He therefore could have asked the minor's mother about it on cross-examination.

Again, the state seems to forget the usefulness and impact that a prior inconsistent statement has. The record shows that Love had enough knowledge even without the undisclosed evidence to ask the minor's mother, "Isn't it true that you changed your mind because Social Services was putting pressure upon you and had taken away your daughter because you did not believe her?" Of course, if the minor's mother stated, "No, they have not put such pressure upon me," then Love would have been stuck with that answer and would have been unable to impeach her with her prior inconsistent statements. Nevertheless, because this evidence would have only been indirect proof in favor of Love, we do not think that its absence meets the Brady materiality standard.

F. Failure to Disclose Statement About Prior Sexual Activity

The undisclosed evidence shows that the minor's mother stated that the summer prior to the alleged rape, two boys had raped her daughter. Clearly such evidence would have been highly material as an alternative explanation for the physical evidence of rape.

_____

[13] It is notable that the state never denied that Social Services was putting such pressure upon the minor's mother.

21

The state makes several arguments. First, the state says the record shows that Love already knew about this allegation. This is false. The record shows only that Love, to defend himself, had asserted that the minor "probably" had had sex with another person. No evidence in the record indicates that Love actually knew that the minor had had sex with someone else or knew about this specific alleged prior rape.

Second, the state asserts that the story about the prior rape was merely a fabrication of the minor's mother. This is mere conjecture by the state. It is up to the jury to decide whether the allegation was fabricated or not. Further, by advancing this argument, the state has indicated the importance of this piece of evidence. If Love had been able to present the evidence, the state would have been in the awkward position of impeaching the credibility of its own witness.

Third, the state says that this evidence would have been inadmissible. Under N.C. Gen. Stat. § 8C-1, Rule 412 (1998), there are limits on the admission of such evidence of prior sexual activity. The state theorizes that at the required evidentiary hearing, the statement would have been found unreliable and therefore inadmissible. See State v. Holden, 416 S.E.2d 415, 417 (N.C. Ct. App.), appeal dismissed, 424 S.E.2d 413 (N.C. 1992) (evidence that someone other than defendant sexually abused the child two and one-half years before the incident resulting in a rape charge against the defendant was properly excluded as being irrelevant and confusing to the jury). [14]

We do not share the state's confidence that this information would not have been admissible. Under Rule 412, evidence of prior sexual acts is admissible to show that the acts charged were not committed by the defendant -- i.e., to offer an alternative explanation for the physical evidence. In Holden, the court refused to admit evidence that the victim may have been sexually abused two and one-half years prior to the incident before the court because the defendant wanted to offer the evidence only for the purpose of suggesting that the person who had committed the prior abuse may have committed the current abuse. Finding that evidence too remote, the court affirmed that it

_____

[14] The state also cites to State v. Ginyard, 468 S.E.2d 525 (N.C. Ct. App. 1996). That case is wholly inapposite, dealing with whether there was evidence of a pattern of prior sexual activity.

22

should not have been allowed. The defendant in <u>Holden</u> had not alleged, as Love has, that the evidence of the prior assault could be used to explain the physical evidence offered by the state.

A case that is more on point is <u>State v. Ollis</u>, 348 S.E.2d 777 (N.C. 1986). In <u>Ollis</u>, a doctor testified that the minor's vaginal opening was larger than it normally would be, consistent with penile penetration. In order to show another source for this corroborating physical evidence, the defendant wanted to offer evidence that the minor had been raped by someone else. <u>Id.</u> at 781-82. The court allowed evidence that another person had sexually abused the minor because"it would have provided an alternative explanation for the medical evidence presented by [the state's doctor] . . . ." <u>Id.</u> That is exactly the reason why Love wants to offer this evidence. The reasoning of <u>Ollis</u> is persuasive in the case at bar:

> However, we are not able to say that the jury would not have had a reasonable doubt about the defendant's guilt if they had known that the only physical evidence corroborating the victim's testimony of rape was possibly attributable to the acts of a man other than the defendant.

<u>Id.</u> at 782. Therefore, this evidence was probably admissible and, in conjunction with the other evidence, we find materiality.

V. <u>Conclusion</u>

Taking the command of <u>Kyles</u> we must view the evidence not only item-by-item, but also in cumulation. <u>Kyles</u>, 514 U.S. at 421. The evidence kept from Love was in some cases directly exculpatory (child denied having been abused, possibility child had been raped by another), and was often very damaging to prosecution witnesses (child had reputation for lying, living in a fantasy world, child had acknowledged and severe emotional problems related to need for attention, initial formal interview with child was perhaps unprofessionally suggestive). This evidence was not merely cumulative. The evidence was of a quantity and a quality different from that which was made known to the jury. We have held that some of this withheld evidence, standing alone, was material. Certainly when all of the undisclosed evidence is viewed in the aggregate, we have no trouble

23

finding that the state violated Love's due process rights by failing to turn over the requested Brady material. The undisclosed "favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." Kyles, 514 U.S. at 434. It would have created "a markedly weaker case for the prosecution and a markedly stronger one for the defense." Id. at 441. Therefore, we hold that there is a reasonable probability that the jury would have found that this evidence created a reasonable doubt in their mind. We remand to the district court with instructions to grant Love's petition and to order his release unless the state chooses to reprosecute him within 90 days. The district court is

REVERSED.

24